UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BRADFORD MORSE, Individually and on Behalf of All Others Similarly Situated, | Case No.: _____ |
| Plaintiff, | |
| -against- | |
| SHARPSPRING, INC., RICHARD CARLSON, STEVEN HUEY, SCOTT MILLER, SAVNEET SINGH, and JASON COSTI, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Bradford Morse ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this class action on behalf of himself and all similarly situated former public stockholders of SharpSpring, Inc. ("SharpSpring" or the "Company") against SharpSpring and the former members[1] of the Company's board of directors (the "Board," or the "Individual Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a)

---

[1] Defendant Carlson was also the Chief Executive Officer of SharpSpring and continued in his capacity as an officer with the post-close company.

and 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

2.     Plaintiff's claims arise in connection with the all-cash sale of SharpSpring to Constant Contact, Inc. (the "Merger"), an online marketing tech company owned by private equity sponsors Clearlake Capital Group, L.P. and Siris Capital Group, LLC (collectively "Constant Contact") for $17.10 per share (the "Merger Consideration").

3.     On July 29, 2021, Defendants solicited shareholders into approving the unfair Merger by issuing a proxy statement (the "Proxy") that contained the following materially false and misleading statements:

> i.     "We believe the assumptions that our management used as a basis for financial forecasts were reasonable at the time made, and that the bases on which the financial forecasts were prepared reflected the best then-currently available estimates and judgments of management of the future financial performance of SharpSpring, given the information our management had at the time." (Proxy at 51);

> ii.     The implied values per share of SharpSpring common stock that SharpSpring's financial advisor calculated in support of its "fairness" opinion using the downward manipulated Fairness Opinion Projections. (Proxy at 47-49).

4.     Both of these material statements are false and misleading for reasons fully explained below. In short, despite fully recognizing the inadequacy of the Merger Consideration, the Board misled shareholders into approving the unfair Merger by (i) directing Company management to downwardly revise SharpSpring's Plan Projections, which had been prepared in the ordinary course business, to create the unreasonably low Fairness Opinion Projections that would achieve support for the desired fairness opinion;

(ii) ordering SharpSpring's financial advisor, JMP Securities LLC ("JMP"), to use the Fairness Opinion Projections to perform the valuation analyses underlying its fairness opinion; and (iii) including the above-identified, material statements in the Proxy that (a) falsely represented the reasonableness of the Fairness Opinion Projections and (b) misled SharpSpring shareholders regarding the fair value of their shares.

5.     The Merger served for SharpSpring's largest owner, Greenhaven Road Capital ("Greenhaven") (owned by Defendant Miller) to liquidate its 10.6% stake in the Company, but denied Plaintiff and other common stockholders the ability to participate in the growth of an innovative and constantly expanding technology business. Further motivating SharpSpring's conflicted insiders, Defendant Carlson rewarded himself and other insiders with a $3 million "transaction bonus pool" payout for concluding the deal.

6.     The special meeting of SharpSpring shareholders to vote on the Merger (the "Shareholder Vote") was held on August 25, 2021 and resulted in the Company's misled shareholders approving the June 21, 2021 merger agreement after relying on Defendants' misrepresentations in furtherance of the Individual Defendants' self-dealing. The transaction closed on September 1, 2021, and resulted in delisting SharpSpring's shares from the NASDAQ Stock Market and denying the Company's public owners the ability to profit from the Company's future growth. The Company continues to exist under the ownership of Constant Contact.

7.     For the foregoing reasons, and as set forth below, Plaintiff seeks to recover

damages from Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant. This Court has jurisdiction over SharpSpring because the Company has its principal place of business in the State of Florida. This Court has jurisdiction over the Individual Defendants because each conducted business in or maintained operations in this State at the times material hereto, serving as a director of a company whose principal place of business is in this State. Additionally, each Individual Defendant committed violations of the Exchange Act within this State, and each has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found in or transact business in this District. Indeed, SharpSpring's executive offices are located in this District in Gainesville, Florida.

## PARTIES

11.     Plaintiff Bradford Morse was at all relevant times a shareholder of SharpSpring.

12.     Defendant SharpSpring, Inc. is a Delaware corporation with principal executive offices located at 5001 Celebration Pointe Avenue, Gainesville, Florida 32608. Prior to the consummation of the Merger, SharpSpring's common stock traded on the NASDAQ Stock Market under the ticker symbol "SHSP."

13.     Defendant Richard Carlson was at all relevant times a director and the Chief Executive Officer of SharpSpring. After the consummation of the Merger, Defendant Carlson received nearly $8 million in golden parachute compensation, including approximately $1.5 million in previously non-existent transaction bonuses, and Defendant Carlson continued with the post-closing company as the Chief Product Officer of Constant Contact.

14.     Defendant Steven Huey was at all relevant times a director of SharpSpring and the Chairman of the Board.

15.     Defendant Scott Miller was at all relevant times a director of SharpSpring and a founder and owner of Greenhaven Road Investment Management, LP (d/b/a Greenhaven Road Capital) and its affiliated entities ("Greenhaven"), which owned 10.6% of SharpSpring stock prior to the acquisition. Miller was appointed to SharpSpring's Board on August 20, 2019, after prior director Daniel Allen resigned from the Board. Miller was simultaneously appointed the chairperson of SharpSpring's Nominating and Corporate Governance Committee, a role previously filled by Daniel Allen.

16.     Defendant Savneet Singh was appointed a director of SharpSpring effective August 17, 2020. Singh assumed the directorship from former director Marietta Davis, who had resigned that same day. Singh was simultaneously appointed chairperson of the Company's Compensation, a post previously held by Davis. Defendant Singh is also, the President and CEO of PAR Technology Corp., a top holding of Greenhaven, and is a known associate of Defendant Miller.

17.     Defendant Jason Costi was at all relevant times a director of SharpSpring. Costi was appointed to the directorship on April 20, 2021, and assumed the role from former director David Buckel, who declined to stand for re-election at SharpSpring's annual shareholder meeting. This was Defendant Costi's first appointment to the board of directors of a publicly traded company after he spent numerous years working in private equity.

18.     The Individual Defendants referred to in ¶¶ 13-17 are collectively referred to herein as the "Individual Defendants" and/or the "Board," and together with SharpSpring they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.      SharpSpring's Background and Resilient Business Model, Strong Performance Through Covid, and Substantial Prospects for Future Growth**

19.     SharpSpring is a rapidly growing provider of cloud-based marketing software sold on a subscription model used to support advertising agencies and e-

commerce. The Company's platform and tool set provides advertising agencies, and other businesses, with an integrated, user friendly interface for managing and automating marketing and sales operations, allowing businesses to substantially reduce the workload involved in marketing and sales related tasks.

20.     The Company's platform offers tools for automating and managing advertising campaigns, customer relationships, email and phone communications, social media accounts, and the collection of customer data. Additional features – among numerous others – include chatbots, shopping cart functions, and form-filling programs that can be integrated into a business's website, as well as data analysis tools that businesses can use to analyze the information resulting from SharpSpring's functions. The platform can also be linked to a wide array of third party applications, expanding its utility further.

21.     Amongst SharpSpring's target customers, the Company is known for its innovative, expanding tool set, strong customer support, and attractive price point – making its platform an increasingly popular choice for its core customer base of digital marketing agencies and online businesses. Access to the platform is purchased via monthly or annual subscription packages, allowing the Company to increase its revenues as it expands and sustains its base of users.

22.     Prior to the Merger, the Company had 1,900 advertising agency customers and 500 "direct" customers using the platform for marketing on their own behalf.

Inclusive of the clients of ad agency customers, approximately 10,000 businesses relied on SharpSpring's services and products, and the Company estimated that it generated approximately $50,000 in revenue on average over the lifetime of a single client subscription. Approximately 250 employees worked for the Company in 2020.

*  *  *

23.     SharpSpring's strong financial performance leading up to the Merger positioned the Company to deliver long-term shareholder growth. The Company's stock price climbed by 200% from January 2018 to February 2020 pre-Covid, 30% from January 2020 to the announcement of the Merger on June 22, 2021, and 180% from the market's low point in March 2020 to announcement.



24.     Further, in quarterly earnings calls from Q1 2020 to Q1 2021 preceding the Merger, Defendant Carlson, the Company's CEO, was clear that SharpSpring's business model positioned the Company for success in the economic environment and that Covid would not slow SharpSpring's growth in the long run. This message was a continuing

theme of these calls, which were the last ones prior to the Merger.

25.    As Defendant Carlson discussed in SharpSpring's Q1 2020 earnings call on May 14, 2020, SharpSpring was "well positioned and ha[d] reduced exposure in the . . . current economic environment" because the Company's platform was "deeply embedded" in its clients' business operations. "The platform is integrated into [a client's] website in countless ways, including forms, landing pages, dynamic content, and automated triggers and workflows."

26.    SharpSpring's platform "houses all of [a client's] email lists . . . email templates . . . and email[s]," and is "generally either integrated with a shopping cart, a third party [customer relationship management system]" or "[SharpSpring's own customer relationship management] capability." The platform is also an "essential technology" for a client's business, since it makes a client "vastly more effective in operating their sales and marketing functions."

27.    Further emphasized by Defendant Carlson, the Company was resilient because it priced its platform at a lower price point than rival options, minimizing customer loss to competing services. As Defendant Carlson emphasized at the start of Covid, "SharpSpring ha[d] always been and remain[ed] the best value in the sales and marketing automation space. As . . . a highly regarded and yet lowest cost provider, [SharpSpring] expect[ed] that customers looking to save costs associated with far more expensive solutions w[ould] continue to turn to SharpSpring as economic conditions

tighten."

28.     Additionally, the Company's customer base was itself economically robust, since the "vast majority of its customers [were] B2B-focused organizations," not the "micro, hyper-local, or consumer-oriented businesses" that "ha[d] been most affected by the coronavirus and associated changes in consumer behavior." Only 2% of the Company's clients fell into that latter category of local businesses, according to Defendant Carlson.

29.     Further protecting the Company's performance, SharpSpring's customer base was highly diversified. No customer represented more than 1% of the Company's revenue, with most only representing "a fraction of a percentage point." In addition, "each of [SharpSpring's agency customers] had their own customers using SharpSpring underneath them, adding a second level of revenue diversification[.]"

30.     Moreover, even by this Q1 2020 call, held on May 14, 2020, Defendant Carlson stated that the Company had been notably stable and was once again back to normal: it "felt . . . like the world paused in March, but . . . sort of quickly recovered."

31.     In the Q2 2020 earnings call held August 13, 2020, Defendant Carlson reaffirmed that the Company's performance had "borne out th[e] thesis" that SharpSpring would function well during Covid. The Company had once again generated record revenue – at $7.3 million for the quarter – had gained 276 new customers, and "[had] taken huge steps forward in terms of revenue retention, EBITDA, cash burn, and gross

margins."

32.     And into Q3 & Q4 2020, Defendant Carlson continued to report that the Company was "consistently gro[wing] its business, expand[ing] [the] platform, and position[ing] . . . for long term success."[2] Though Covid temporarily impacted customer acquisition, increased returns per new customer had "largely made up the difference." Moreover, during this same time period, the SharpSpring platform was gaining traction with higher-revenue clients, like larger advertising agencies, and garnering favorable coverage from software review sites, improving the Company's reputation in its addressable market. As "economic conditions improv[ed]" further, Defendant Carlson thus expected to see a "greater acceleration on the business."

33.     Analysts covering the Company took note. In December 2020, for example, Needham analyst Scott Berg predicted the Company's stock would reach $25. And in March 2021, Canaccord Genuity analyst David Hynes, Jr. raised his price target for SharpSpring from $18 to $22 per share, while Eric Martinuzzi of Lake Street raised his price target $18 to $20. Additionally, as a financial commentator on technology companies noted, SharpSpring's stock had the potential to rise dramatically higher – i.e., up to $38 per share – if shares started trading at a sales-to-share-price multiple more reflective of peer companies in the sector:

> SharpSpring's peer group of SaaS companies trades at much higher multiples than it does. Most SaaS companies trade at 6 - 8x sales and above.

---

[2]   In the Q4 2020 earnings call held on March 16, 2021

As mentioned earlier, HUBS trades at 12x sales. A 12x sales multiple on SharpSpring's 2021 sales of $36 million would imply a $442 million market cap for SHSP or $38 per share, a near quadruple from its current $10.50 share price. At a more pedestrian 8x sales, SHSP would trade at $26 per share, a 150% uplift from current levels. While the company is currently slightly unprofitable today, 20% operating margins in a few years are not out of the question with 20%+ revenue growth, 74% gross margins, and tight operating expense control.[3]

34.    Lending support to these predictions, SharpSpring in Q1 2021, forecasted strong, even exponential, growth in the B2B marketing automation systems sector out to at least 2025:



35.    These high expectations for the Company and sector were borne out by the

---

[3] *See*, *SharpSpring: Underfollowed SaaS Company Trading at 3x Revenue Compared to Peer HubSpot Trading at 12x Revenue*, Seeking Alpha (Sep. 21, 2020) (https://seekingalpha.com/article/4375467-sharpspring-underfollowed-saas-company-trading-3x-revenue-compared-to-peer-hubspot-trading)

Company's performance in Q1 2021. During that quarter, the Company's quarterly revenue increased by 13% (to $8 million) relative to the prior year, with quarterly gross profit (revenue less cost of sales) climbing by 30% to a record $6.1 million over the same period. Though the Company posted a GAAP net loss of $2.6 million in the quarter, this was consistent with SharpSpring's background as a growing tech company that in the near term prioritized customer acquisition and top line revenue expansion over bottom line accounting metrics – positioning the Company for stronger future growth.

36.     And as Defendant Carlson advised in the earnings call for Q1 2021 held in May 2021 – the month prior to the merger – "[the Company] [was] right on track . . . to achieve [its] long term objective of reaching $100 million in revenue." In his view, SharpSpring "ha[d] a clear runway to growth simply by layering on customer cohorts that behave[d] just like the ones [it had] been layering on for upwards of seven years[.]" Defendant Carlson reiterated this optimism about the Company's prospects in SharpSpring's Q1 2021 press release, stating that the business "remain[ed] on the path to achieving our long-term $100 million ARR target we introduced in November."

37.     In summary, after fifteen consecutive quarters of record revenue production, optimistic statements by Defendant Carlson, strong financial performance through Covid, and high analyst expectations, SharpSpring shareholders had strong cause for optimism about the Company's ability to deliver a share price reflective of its expanding userbase, adaptable and resilient business model, and innovative technology.

**B.     Defendants Created and Approved the Unreasonably Low Fairness Opinion Projections to Justify the Unfair Merger Consideration That Resulted from a Flawed and Conflicted Sales Process**

38.     Notwithstanding SharpSpring's positive outlook and public statements regarding the Company's growth potential, Defendants Miller and Carlson were working behind the scenes from Q3 2020 to Q1 2021 to position the Company for a sale.

39.     Defendant Miller owned 10.6% of the Company through Greenhaven Road Investment Management, LP ("Greenhaven"), his hedge fund, and had gained his seat on the Board in August 2019 after a prior board member stepped down – a repeated pattern for SharpSpring during the Merger process. Defendant Miller's 10.6% interest made him SharpSpring's largest owner, and the Company in turn was one of Greenhaven's top five holdings.

40.     Greenhaven started accumulating its stake in SharpSpring by 2017, when the Company's share price hovered at around $4. As Defendant Miller indicated in his fund's Q3 2018 investor letter, the investment had been based on the Company's strong track record of growth, but with the awareness that merger activity in the sector could be used to allow Greenhaven to exit its investment at a premium:

> SharpSpring has become a Top 5 holding through a combination of price appreciation and the purchase of additional shares over several months. SharpSpring is a SaaS (Software as a Service) business that provides marketing automation software primarily for digital marketing agencies who utilize their technology to run sophisticated digital campaigns that include web pages customized based on a visitor's historical activity. […]
>
> SharpSpring has benefitted from multiple expansion, but also has

14

executed well. Product revenue grew 40% in their last reported quarter. In a more recent press release, the company announced a record number of new customers in Q3 while maintaining marketing efficiency (their LTV/CAC should remain above 6). *There is a very long runway for growth for SharpSpring*. The company will benefit from secular tailwinds in an industry growing over 20% per year. *There is also a history of acquisitions in the space at premiums to where shares trade today*. SharpSpring came to my attention through a conversation with Jeremy Kahan of North Peak[.]

41.     Due to the size of Greenhaven's investment in SharpSpring, Greenhaven's most viable exit strategy was a cash deal. By late 2019, Defendant Miller was interested in a merger or acquisition, and began seeking a more active role in leading the Company. For example, in Defendant Miller's Q2 2019 investor letter for Greenhaven issued prior to his appointment to SharpSpring's board, Defendant Miller adverted his plan to join the Board and pursue a sale of the Company:

The simple heuristic is that meetings are bad, but *I have come to believe that being involved on the board of SharpSpring could be very beneficial*. First, I believe that it can lead to better returns for our fund by giving us a seat at this company's capital allocation table. *SharpSpring has to make critical decisions among growth, capital preservation, and capital raising. The answers are not obvious. I would like a role in helping to flesh out those decisions and communicating them to shareholders. In addition, there have been more than a dozen acquisitions of marketing technology companies including Adobe's acquisition of SharpSpring direct competitor Marketo at 12X revenue. A similar multiple would imply well in excess of 200% return for current SHSP shareholders. I believe that SharpSpring has an attractive opportunity in front of it*, and not selling may also be a very smart decision. I think our partnership would benefit if we had voice at the table.

42.     In August 2020, Defendant Miller took a more direct approach to push for a sale and handpicked his known associate, Defendant Singh, to join the Board. Defendant Singh would support Defendant Miller's influence over the Board and assist

Defendant Miller's efforts to have SharpSpring sold.

43.     Defendant Singh is the President and CEO of PAR Technology Corp., one of Greenhaven's primary holdings. Moreover, in Greenhaven's investor letter for Q3 2020, Defendant Miller expressly confirmed that he was responsible for Defendant Singh's appointment to the Board:

> I have always respected PAR CEO Savneet Singh, who is an A player in my book. He has experienced the technology sector as an investor and operator, and has an outstanding network. From my position as a member of the SharpSpring board of directors, I reached out to Savneet to see if he had any recommendations of people in his network when it became clear that we needed to add a new director. To my pleasant surprise, he indicated that he himself might be interested as a way to stay tapped into the industry outside of the technology/restaurant-centric world he was currently operating in. After a series of approvals, Savneet joined the SharpSpring board this summer.

44.     Not only did Defendant Singh replace former Board member, Marietta Davis, whom Defendant Miller had no specific relationship with, but Defendant Singh also assumed Ms. Davis's former role as the chairperson of SharpSpring's Compensation Committee.

45.     Together, Defendant Miller (who was the chairperson of SharpSpring's Nominating and Corporate Governance Committee) and Defendant Singh had control over the Board's composition and management's compensation – positions of power Defendant Miller would leverage to secure a sale of the Company.

46.     Within days of Defendant Singh's appointment to the Board, SharpSpring met with investment bankers and instigated its merger sales process.

47.     Defendant Miller expressed his preference for a cash deal early on in negotiations and enforced that preference throughout the process. For example, Defendant Miller inserted himself directly into the negotiation process – despite being neither a member of management nor the Chairman of the Board – to dissuade an early bidder seeking a stock deal from continuing in the sales process. In fact, Defendant Miller was the only non-management director to directly participate in any merger negotiations.

48.     In October 2020, the Board and management began discussing the 2021-2022 Company budget and projections. The two sides discussed the Company's record financial results, as detailed above, but noted that the Covid pandemic was still ongoing and needed to be accounted for in the Company's financial plan. Accordingly, at the direction of the Board, management agreed to refine the Company's financial projections to account for these discussions.

49.     Also, in late October 2020, JMP (the Company's financial advisor) presented its preliminary valuation of the Company and a timeline for the sales process.

50.     On January 4, 2021, Defendants Carlson and Miller held a call with the management of Party B to discuss the structure of a potential merger. Upon learning that Party B was only interested in a stock transaction, Defendant Miller took steps to kill any potential offer. Two days after the call on January 6, 2021, Defendant Miller had private communications with Defendant Carlson to dissuade him of any interest in a deal with Party B. The next day, Defendants Miller and Carlson had another call with the CEO of

Party B to deliver the same message to him directly.

51.     During this same time period, Company management was finalizing its financial projections for 2021-2022. Interestingly, on January 19-21, 2021, Company management met with JMP to discuss the financial projections with the banker before receiving approval or even meeting with Board.

52.     On January 29, 2021, Company management met with the Board to discuss SharpSpring's financial projections. Management and the Board discussed the ongoing financial results of the Company, including the fifteenth consecutive quarter of record revenue, and the assumptions underlying the Company's financial projections, including the changes made since October. Following this discussion, the Board approved these financial projections (the "Plan Projections").

53.     At this same meeting on January 29, 2021, the Board agreed to an outright sale of the Company, as opposed to any other strategic transaction. Shortly thereafter, JMP reached out to several parties and discussions ensued.

54.     Reading the writing on the wall, SharpSpring's longest standing Board member, and chair of the Audit Committee, David A. Buckel, decided not to stand for re-election to the Board. Mr. Buckel's departure represented the second jettison of an established SharpSpring Board member since Defendant Miller ramped up the sales process. To replace Mr. Buckel, Defendant Miller appointed Defendant Costi to his first ever board of directors seat. Not only did Defendant Costi spend over a decade in private

equity – and thus would be helpful in facilitating a sale to a private equity firm – but by joining the Board in the eleventh hour, Defendant Costi had little to no skin in the game and would put up little resistance to any potential sale.

55.     In March 2021, JMP initially reached out to Constant Contact. On May 4, 2021, Constant Contact made an opening offer of $17-$19 per share. The Board met that same evening to discuss. Deciding that even the high end of Constant Contact's offer range was inadequate, the Board instructed Defendant Carlson to continue negotiations to obtain a price above Constant Contact's indicated range.

56.     Two days later, the Board held a special meeting with JMP to receive JMP's insight on the deal. At that meeting, JMP provided an updated presentation of its preliminary valuation analyses. Based on this presentation, the Board determined that its decision on the evening of May 4th to seek a price higher than $19 per share was correct.

57.     On May 11, 2021, Constant Contact indicated that it was not willing to offer more than its $17-$19 range. This should have been the end of discussions. Since the Board, JMP, and Company management had all indicated that the fair value of the Company was greater than Constant Contact's proposed range, the Company should have been unwilling to accept a deal that failed to adequately compensate shareholders for SharpSpring's value.

58.     At the very least, the Company and the Individual Defendants should have made an all-out effort to force Constant Contact to increase its offer. Instead, the Board

and management began detailed discussions aimed at carving out protections for their personal, private interests while fully aware that a deal with Constant Contact would deliver inadequate compensation to Company shareholders.

59.     In other words, Defendants recognized the inadequacy of Constant Contact's terms, but opted to secure private benefits for themselves instead of looking out for the interests of the Company's public shareholders.

60.     On May 23, 2021, Company management, JMP, and the Board began discussions regarding transaction consummation details, including directors' and officers' liability insurance and transaction-related bonuses. Defendants Miller and Huey met to discuss the creation of a transaction-related bonus pool to induce members of Company management to support the forthcoming cash-out.

61.     Notably, Defendant Singh – the nominal chair of the Compensation Committee – was not present for this discussion. Despite Defendant Singh's putative oversight regarding compensation, Defendant Singh knew that Defendant Miller was the one calling the shots.

62.     By May 30, 2021, Defendants Miller and Huey proposed the creation of a transaction bonus pool in the aggregate amount of $1.5 million, $1.0 million of which would be payable directly to Defendant Carlson, to incentivize management to close the forthcoming Merger. The next day, this information was communicated to Constant Contact, and the parties began arranging the timing of the transaction before even settling

on a price.

63.     On June 2, 2021, Constant Contact made an updated offer of $17 per share – a value at the very bottom of a range that had already been deemed insufficient at its highest point. Once again, instead of rejecting Constant Contact's wholly inadequate offer, Defendants doubled down on their efforts to consummate a cash sale at any price.

64.     That evening, the Board set in motion a plan to reduce the Company's financial projections, and also immediately doubled management's transaction bonus pool from $1.5M to $3M to incentivize management's cooperation.

65.     On June 4, 2021, JMP presented an updated valuation analysis based upon the lowered $17 bid. Immediately after this presentation, the Board instructed Company management to create a new set of financial projections for use in JMP's financial analyses that were lower than the Plan Projections (the "Fairness Opinion Projections").

66.     Over the next 10 days, SharpSpring management worked on reducing the Company's financial projections and providing a final set of lower projections to JMP that JMP could use find the Merger Consideration "fair" to SharpSpring shareholders.

67.     On June 15, 2021, Company management met with JMP to review the Fairness Opinion Projections. Once again, it is important to note that management went directly to JMP before presenting the projections to the Board.

68.     On June 17, 2021, management provided the Fairness Opinion Projections to the Board.

69.     The next day, on June 18, 2021, JMP presented updated financial analyses to the Board utilizing the Fairness Opinion Projections for their "contemplated" fairness opinion. Only after reviewing the banker approved Fairness Opinion Projections, and confirming that the downward manipulated numbers served their purpose of securing a fairness opinion, did the Board authorize their use.

70.     Three days later, the Board and JMP repeated their dance from the successful dress rehearsal, and the Board approved the Merger, despite knowing it represented inadequate value for SharpSpring shareholders.

* * *

71.     The Fairness Opinion Projections represented a severe downgrade to the legitimately prepared Plan Projections that was incompatible with the Company's strong financial results (as outlined above) and inconsistent with SharpSpring's publicly-expressed optimism regarding its future prospects.

72.     The Fairness Opinion Projections slashed every financial metric across the Board by 9% to 39%:

//

| | | 2021 | 2022 |
|---|---|---|---|
| **Revenue** | Plan Projections | $ 37,400,000 | $ 45,800,000 |
| | Fairness Opinion Projections | $ 33,400,000 | $ 41,400,000 |
| | **% Change** | **-10.70%** | **-9.61%** |
| **Gross Profit** | Plan Projections | $ 28,800,000 | $ 35,600,000 |
| | Fairness Opinion Projections | $ 25,600,000 | $ 32,400,000 |
| | **% Change** | **-11.11%** | **-8.99%** |

| | | | |
|---|---|---|---|
| **Operating Income** | Plan Projections | $ (10,700,000) | $ (10,500,000) |
| | Fairness Opinion Projections | $ (13,000,000) | $ (13,600,000) |
| | **% Change** | **-21.50%** | **-29.52%** |
| **Adjusted EBITDA** | Plan Projections | $ (7,400,000) | $ (7,200,000) |
| | Fairness Opinion Projections | $ (9,400,000) | $ (10,000,000) |
| | **% Change** | **-27.03%** | **-38.89%** |

73.     As evident from the chart above, the scale of downward revisions worsened down the balance sheet and over time. This is significant for two main reasons. First, as explained below, changes to the down the line metrics – Adjusted EBITDA and the cash flow projections derived therefrom – have the most direct impact on the Company's valuation. Second, the changes to the down the line metrics are both the most severe and the most distant from the reality of the Company's expected future financial performance.

74.     Extended out to 2026, these downward revisions had a substantial negative impact on the Company's projected free cash flow. This, in turn, directly reduced the Company's implied equity value under a discounted cash flow analysis – the most

important valuation method JMP used to value the Company.[4] [5] [6] As the technique's name suggests, a discounted cash flow analysis calculates the value of a business based on the present value of the business's projected future free cash flows.

75.     Due to the method's operation, a discounted cash flow analysis is acutely sensitive to small differences in the underlying financial inputs affecting a Company's projected future cash flows, particularly to the extent these inputs alter the growth rate of projected cash flows. As explained by a highly respected professor with expertise in the study of M&A transactions:

> [A] discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate

---

[4]   "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[5]   "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.

[6]   "In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014.

discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. […]

This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.[7]

76.     Here, the severe reductions to SharpSpring's projected cash flows resulted in a lower implied value for Company, enabling Defendants to mislead shareholders into accepting an inadequate price for their shares. Thus, although SharpSpring in reality viewed market conditions as a speedbump and not a long term impediment to growth and cash flows, shareholders were denied a deal reflective of the Company's true value.

### C.     Motivations for the Downward Revisions and Creation of the Fairness Opinion Projections Necessary to Accomplish the Unfair Merger

77.     Three main facts motivated the foregoing downward revision: (i) Defendant Miller, the Company's 10.6% owner, wanted to liquidate without undermining the value of Greenhaven's stake in the Company; (ii) after realizing that Constant Contact's offer price would not amount to fair value of SharpSpring, Defendants Carlson, Miller, and Huey arranged to have the Company pay Defendant Carlson a $1 million transaction bonus at the completion of a deal, motivating him to

---

[7] Steven M. Davidoff, Fairness Opinions, 55 AM. U. L. REV. 1557, 1573-78 (2006).

assent to the Merger even at an inadequate price; and (iii) JMP was paid using a fee

structure contingent on concluding a deal, meaning that it had no incentive to act as the

voice of reason in the room and keep the foregoing conflicts in check.

**(i)   Defendant Miller's Interest in Liquidating Greenhaven's Stake in SharpSpring**

78.     Greenhaven, owned by Defendant Miller, was SharpSpring's largest owner

prior to the Merger. Its holdings in SharpSpring were in the name of Greenhaven Road

Investment Management, L.P. which held 1,365,674 shares in total, or 10.6% of shares

outstanding as of July 28, 2021. Greenhaven had started accumulating this stake in

SharpSpring by 2017, when the Company's share price hovered at around $4.

79.     As Defendant Miller indicated in his fund's Q3 2018 investor letter,

Greenhaven had invested in SharpSpring based on the Company's strong track record of

growth, but was also fully aware that a merger would allow Greenhaven to exit its

investment at a premium:

> SharpSpring has become a Top 5 holding through a combination of price
> appreciation and the purchase of additional shares over several months.
> SharpSpring is a SaaS (Software as a Service) business that provides
> marketing automation software primarily for digital marketing agencies who
> utilize their technology to run sophisticated digital campaigns that include
> web pages customized based on a visitor's historical activity. […]
>
> SharpSpring has benefitted from multiple expansion, but also has
> executed well. Product revenue grew 40% in their last reported quarter.
> In a more recent press release, the company announced a record number
> of new customers in Q3 while maintaining marketing efficiency (their
> LTV/CAC should remain above 6). *There is a very long runway for
> growth for SharpSpring*. The company will benefit from secular tailwinds in

an industry growing over 20% per year. *There is also a history of acquisitions in the space at premiums to where shares trade today.* SharpSpring came to my attention through a conversation with Jeremy Kahan of North Peak[.]

80.     By late 2019, Defendant Miller was interested in a merger or acquisition, and began seeking a more active role in leading the Company. For example, in Defendant Miller's Q2 2019 investor letter for Greenhaven issued prior to his appointment to SharpSpring's board, Defendant Miller adverted to his plan to join the Board and sell the Company:

> The simple heuristic is that meetings are bad, but *I have come to believe that being involved on the board of SharpSpring could be very beneficial.* First, I believe that it can lead to better returns for our fund by giving us a seat at this company's capital allocation table. *SharpSpring has to make critical decisions among growth, capital preservation, and capital raising. The answers are not obvious. I would like a role in helping to flesh out those decisions and communicating them to shareholders. In addition, there have been more than a dozen acquisitions of marketing technology companies including Adobe's acquisition of SharpSpring direct competitor Marketo at 12X revenue. A similar multiple would imply well in excess of 200% return for current SHSP shareholders. I believe that SharpSpring has an attractive opportunity in front of it*, and not selling may also be a very smart decision. I think our partnership would benefit if we had voice at the table.

81.     In August 2020, Defendant Miller took action and had Defendant Singh appointed to SharpSpring's Board to help effectuate a sale and support Defendant Miller's influence over the Company. As detailed above, Defendant Singh is a known associate of Defendant Miller, and is President and CEO of PAR Technology Corp., one of Greenhaven's primary holdings.

82.     Due to the size of Greenhaven's investment in SharpSpring, Greenhaven's

most viable exit strategy by 2021 was a cash deal. Defendant Miller expressed his preference for a cash deal during the negotiations process, for instance by pushing SharpSpring and Defendant Carlson away from a stock transaction with Party B.

83. Defendant Miller also strongly supported the Board's determination in January 2021 that a sale of the Company was the best option for SharpSpring shareholders. Additionally, as stated above, Defendant Miller was key in creating the transaction bonus pool to incentivize Defendant Carlson and his management team to create the Fairness Opinion Projections and complete the Merger.

### (ii)   Defendant Carlson's Payout from the Transaction Bonus Pool

84. In May 2021, Defendant Carlson began arranging for the creation of a transaction bonus pool that would offer him a considerable payout at the conclusion of a deal. Defendant Carlson first discussed the pool with representatives of JMP, who indicated their approval and then continued discussions with Defendants Huey and Miller. The first approved bonus pool was $1.5 million, with $1 million payable to Defendant Carlson. But after Constant Contact lowered their offer to $17 per share, and immediately prior to requesting the lower Fairness Opinion Projections, Defendants double the pool amount to $3 million, with $1 million payable to Defendant Carlson and the remainder distributed to Company management.

85. Constant Contact not only consented to the plan, but in effect agreed to subsidize the arrangement by raising its bid by $1.29 million (at ten cents more per share)

as a direct response to being told of the payout arrangement on June 3, 2021. For Constant Contact, this was money well spent – just over a million dollars to directly buy the goodwill of the management on the other side of the negotiating table, instead of paying the tens of millions of dollars needed to provide fair value to SharpSpring shareholders.

86.     For Defendant Carlson, this represented a significant pay increase that he would not have otherwise received. In total, Defendant Carlson stood to receive nearly $8 million in golden parachute compensation.

87.     In addition, Defendant Carlson – and the rest of SharpSpring's officers – received additional employment benefits and the opportunity to fully participate in the future growth of the Company, including a Retention Bonus negotiated with Constant Contact for a cash payment to Defendant  Carlson of $479,661.60.

88.     Notably, these Retention Bonuses were arranged despite the Proxy's apparently contradictory statement that none of the Company's executive officers had "entered into any new agreement or arrangement with SharpSpring, Parent or any of their affiliates regarding employment with . . . the Surviving Corporation[.]"

89.     To put the value of these bonuses into perspective: given his holdings in SharpSpring, Defendant Carlson needed to secure an offer price of $22 per share to gain the same amount purely from Merger Consideration that he gained from bonuses.

90.     By actively negotiating with the Board and Constant Contact for unshared financial benefits at the same time he was supposed to be promoting the interests of the

Company's public owners, Defendant Carlson put himself on a very different footing than SharpSpring's ordinary shareholders.

### (iii)   JMP's Conflicted Fee Structure

91.   JMP was disincentivized from keeping the above conflicts in check because its compensation structure was largely contingent on SharpSpring completing a deal. JMP's total compensation amounted to $6.35 million, of which only $750,000 was payable regardless of outcome. Thus, over 88% of JMP's compensation was payable only upon consummation of the Merger. As a result, if JMP had advised Defendant Carlson or the Board that it was a bad time to sell or that Constant Contact was offering too low of a price, its bankers would have lost nearly all their compensation.

92.   As is well documented in academic literature concerning conflicts in the merger and acquisition process, deal bankers are notorious for using an incentive structure that encourages them to capitulate to company management and support transactions that fail to promote shareholder value. *See* Jonathan R. Macey, The Regulator Effect in Financial Regulation, 98 Cornell L. Rev. 591, 618-23 (March, 2013) (explaining that "obtaining a fairness opinion has become like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate."). *See also* Steven M. Davidoff, Fairness Opinions, 55 AM. U.L. REV. 1557 (August 2006):

[C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…*conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.*

This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction. This will ensure future lucrative business. (Emphasis added).

93.    Accordingly, it was virtually guaranteed that JMP would not risk ostracizing itself in the investment banking community by declining to render a fairness opinion or pushing Defendant Carlson and the Board to find a better deal.

### D.    The False and Misleading Statements in the Proxy

94.    Defendants solicited shareholder approval for the Merger by filing a false and misleading Proxy with the SEC. This Proxy misled shareholders about SharpSpring's value by making false and misleading statements concerning the Fairness Opinion Projections and the value of SharpSpring shares. Specifically Plaintiff challenges the following statements from the Proxy as false and/or misleading:

    i.    "We believe the assumptions that our management used as a basis for financial forecasts were reasonable at the time made, and that the bases on which the financial forecasts were prepared reflected the best then-currently available estimates and judgments of management of the future financial performance of SharpSpring, given the information our management had at the time." (Proxy at 51);

    ii.    The implied values per share of SharpSpring that JMP calculated in support of its "fairness" opinion using the downward manipulated Fairness Opinion Projections. (Proxy at 47-49).

95.    First, the Proxy falsely stated that the Board believed that "the assumptions that [Company] management used as a basis for financial forecasts were reasonable at the time made, and that the bases on which the financial forecasts were prepared reflected the best then-currently available estimates and judgments of management of the future financial performance of SharpSpring, given the information [Company] management had at the time."

96.    As set forth above, this statement was false: the Board ordered Company management to create downwardly revised projections only *after* learning that Constant Contact was willing to pay less previously expected. Further, Defendant Carlson and Company management created the Fairness Opinion Projections based on downward revisions and artificial assumptions that were inconsistent with their own publicly-expressed optimism regarding SharpSpring's future. The Board was aware (i) that the Fairness Opinion Projections were created at their request; (ii) of the content of the Company's and management's optimistic public statements; (iii) that that the downward revised Fairness Opinion Projections contradicted these optimistic statements; and (iii)

that that the downward revised Fairness Opinion Projections needed to be created to justify a fairness opinion. The downward revisions were thus intended to reduce the Company's appraised value – not create projections that were more reflective of the Company's financial reality. In short, the Board did not believe that the Fairness Opinion Projections were based on management's best estimates of the Company's future performance.

97.     Second, the values per share of SharpSpring common stock resulting from JMP's analyses were false and misleading because the valuations resulted from artificial inputs intended to bring down the Company's appraised worth. As explained, the Proxy used a discounted cash flow analysis to present a valuation of SharpSpring common stock to the Company's shareholders. This valuation, although swaddled with boilerplate disclaimers and provisos, fundamentally asserted that SharpSpring stock was worth "$11.33 to $17.33" per share. However, this valuation was false and misleading because its underlying inputs failed to reflect reality. Accordingly, the resulting equity reference range induced shareholders to sell their stock at less than fair value.

**E.     SharpSpring Shareholders Suffered Financial Harm as a Result of the False and Misleading Proxy**

98.     The Proxy caused SharpSpring's stockholders harm by inducing them to accept a merger that underpriced the Company and therefore failed to compensate stockholders for the inherent value of their shares. Moreover, since the acquisition could not have occurred without the approval of Company shareholders, the Proxy was an

essential link in the accomplishment of the sale and the misleading statements were the cause of the Class's economic loss.

99.    First, the Merger Consideration represented **36% *discount*** to the Company's publicly traded price as recently as February 2021, when SharpSpring stock traded $26.78 per share.

100.    Second, the Merger sold the Company for less on a per share basis than the lowest Street valuation analyses available in March 2021, which valued SharpSpring stock in the range of $18-25 per share.[8] I.e., without even accounting for a transaction premium, expert analysts predicted SharpSpring's stock would reach $25 per share.

101.    Notably, JMP opted to not provide any analysis or summary of these analyst price targets, as is commonplace in merger proxy statements – leaving shareholders in the dark about Wall Street's valuation of the Company and the Merger Consideration's relative lack of value. Analyst reports are proprietary and not easily accessible to the public even in summarized form, with even secondhand descriptions of their contents often only available on boutique financial media websites. JMP's decision to ignore these reports is a strong signal that SharpSpring was worth far more than the Merger Consideration provided.

---

[8]  *See*, *SharpSpring, Inc. Released Earnings Last Week and Analysts Lifted Their Price Target To US$21.25*, Yahoo Finance (Mar. 19, 2021) ("Currently, the most bullish analyst values SharpSpring at US$25.00 per share, while the most bearish prices it at US$18.00.")  (https://finance.yahoo.com/news/sharpspring-inc-nasdaq-shsp-released-063319421.html)

102.   Third, as financial commentators reported, SharpSpring's stock had the potential to dramatically rise in value if it started trading at a sales-to-share-price multiple more reflective of its peer companies in the marketing automation sector. For instance, if the Company started trading along with its peers at 12x its revenue, then the Company's stock price would range $26 to $38 per share. Notably, this 12x revenue figure is not cherry picked from a single commentator, but the same figure used by Defendant Miller in his letter to Greenhaven investors.

103.   At bottom, if Company shareholders had been informed of SharpSpring's true value at the time of the acquisition, the Board would have been unable to obtain a fairness opinion from JMP, and SharpSpring shareholders would not have voted to approve the Merger offering them $17.10 per share. Moreover, Defendants' conduct caused Company shareholders to lose out on alternative options that offered greater value, including independently growing the Company or seeking better offers from alternative bidders, including potential stock transactions (precluded by Defendant Miller) that would have allowed shareholders (and not just Company management) to continue in the strong future growth of the Company.

104.   Accordingly, SharpSpring shareholders suffered damages in the amount of the difference between the price received in the Merger and the fair value of their shares as calculated in accordance with recognized methods of valuation.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of SharpSpring (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

106.    This action is properly maintainable as a class action because:

(a)    the Class is so numerous that joinder of all members is impracticable. As of July 28, 2021, the record date to vote on the Merger, there were 12,886,660 shares of SharpSpring common stock outstanding, held by hundreds to thousands of individuals and entities throughout the country. The actual number of former public stockholders of SharpSpring will be ascertained through discovery;

(b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.    whether Defendants misrepresented material information in the Proxy in violation of Section 14(a) of the Exchange Act;

ii.    whether the Defendants violated Section 20(a) of the Exchange Act; and

iii.    whether the Class suffered damages.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### (Against All Defendants)

107.   Plaintiff realleges the allegations set forth in paragraphs 1 through 106, above, as if fully set forth herein.

108.   Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name

to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

109. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

110. Defendants issued the Proxy to solicit SharpSpring shareholders' support for the Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which misrepresented and omitted the above-referenced material information, which in turn rendered the above-referenced sections of the Proxy materially false, misleading, and incomplete because such sections provided a false, misleading, and incomplete valuation picture of SharpSpring. The Proxy contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

111. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of SharpSpring, and as alleged above, were aware of the SharpSpring valuation information but failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. The Individual Defendants knew that the Proxy was materially false, misleading, and incomplete in

regard to the above-referenced material information. The Individual Defendants reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that JMP reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by JMP as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the true facts concerning the process involved in selling SharpSpring and SharpSpring's true value, which was far greater than the Merger Consideration the Company's former shareholders received.

112.   The Individual Defendants knew that the material information identified above had been misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete. Indeed, the Individual Defendants were required to review JMP's valuation analyses, question JMP as to its derivation of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. After reviewing both the underlying materials and the Proxy, the Individual Defendants failed to provide a non-misleading proxy solicitation.

113.   Each of the Individual Defendants was responsible for ensuring that the

39

Proxy was not misleading, but failed to do so. Indeed, on July 29, 2021, the Proxy was signed "By order of the Board of Directors."

114.   SharpSpring is liable for violations of the Exchange Act as the issuing entity of the Proxy and based on the Individual Defendants' violations of the Exchange Act.

115.   The above-referenced information that was mispresented and omitted in the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially false, misleading, and incomplete.

116.   As a direct and proximate result of the dissemination of the materially false, misleading, and incomplete Proxy that Defendants used to obtain shareholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

117.   Plaintiff realleges the allegations set forth in paragraphs 1 through 106, above, as if fully set forth herein.

118.    The Individual Defendants acted as controlling persons of SharpSpring within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of SharpSpring, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control – and did influence and control – directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false, misleading, and incomplete.

119.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

120.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the members of the Board to approve the Merger. Moreover, as members of the Board, each of the Individual Defendants is responsible for signing the Proxy "By order of the Board of Directors." They were thus

directly involved in preparing this document.

121.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in (i) negotiating, reviewing, and/or approving the Merger and (ii) preparing, reviewing, and/or approving the Fairness Opinion Projections. The Proxy describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

122.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

123.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment and relief as follows:

A.       Declaring that this action is properly maintainable as a Class Action and

certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 20, 2021

**SMITH, GAMBRELL & RUSSELL, LLP**

*/s/ Richard D. Rivera*
Alan S. Wachs
Florida Bar No.: 980160
awachs@sgrlaw.com
tgreene@sgrlaw.com
dhsmith@sgrlaw.com
Richard D. Rivera
Florida Bar No.: 0108251
rrivera@sgrlaw.com
aarrazola@sgrlaw.com
50 N. Laura Street, Suite 2600

Jacksonville, Florida 32202
Tel.: (904) 598-6110
Fax: (904) 598-6210

And

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde (*pro hac vice*
forthcoming)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*