**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

BRADFORD MORSE,

Plaintiff,

v. CASE NO. 1:21cv209-RH-HTC

SHARPSRING, INC. et al.,

Defendants.

_______________________________/

**ORDER DISMISSING THE AMENDED COMPLAINT AND GRANTING LEAVE TO AMEND FURTHER**

This is a proposed class action under the Private Securities Litigation Reform Act. The shareholders of SharpSpring, Inc. approved a plan of merger—in effect, a cash sale of all shares. The shareholders received no further compensation—no interest in the surviving corporation.

The plaintiff Bradford Morse was a SharpSpring shareholder at the time of the transaction. The defendants are SharpSpring and the individuals who were the members of its Board of Directors.

Mr. Morse asserts the proxy statement soliciting shareholder approval was false in two respects and that, but for the falsehoods, the shareholders would not

have approved the transaction. The first alleged falsehood was, in essence, that SharpSpring's directors actually *believed* the financial projections underlying their recommendation to approve the transaction. The second alleged falsehood was the implied per-share value calculated based on the projections. Mr. Morse asserts that, if the transaction was to go forward at all, the shares should have brought a higher price.

In the first amended complaint, usually referred to in this order simply as "the complaint," Mr. Morse asserts a claim under Securities Exchange Act § 14(a), which addresses false representations in proxy statements, and § 20(a), which addresses controlling-person liability for violations of the Act. The defendants have moved to dismiss for failure to state a claim on which relief can be granted. This order grants the motion but allows the plaintiff to file a second amended complaint.

## I. Standards on a Motion to Dismiss

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under Federal Rule of Civil Procedure 9(b), a plaintiff must "state with particularity" circumstances constituting fraud or mistake. The particularity requirement applies to securities claims like those at issue here. *See, e.g.*, *Carvelli*

*v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317–18 (11th Cir. 2019). To satisfy this requirement, a plaintiff must allege what statements were made, in what documents, when, where, by whom, how the statements were misleading, and what the defendant received from the fraud. *Carvelli*, 934 F.3d at 1318; *see also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

The Private Securities Litigation Reform Act underscores the particularity requirement. Under 15 U.S.C. § 78u-4(b)(1), when a plaintiff alleges the defendant made an untrue statement of material fact, the complaint must specify each statement alleged to be misleading and the reasons it was misleading. For an allegation made on information and belief—as the critical allegations here were—the complaint must state with particularity the facts on which the belief was formed. This requirement applies to "any private action arising under this chapter"—that is, under the Securities Exchange Act, 15 United States Code Chapter 2B. These requirements apply to § 14(a) claims. *See In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1330 (N.D. Ga. 2016).

The PSLRA also provides that if a "plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," the complaint must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). The

Supreme Court has left open the question whether a particular state of mind—that is, "scienter"—is an element of a § 14(a) claim. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 n.5 (1991). The Eleventh Circuit has not resolved the issue, but district courts in the circuit have held heightened scienter pleading is not required under § 14(a), at least in some circumstances. *See Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1290 (S.D. Fla. 2009); *Harvey M. Jasper Ret. Tr. v. Ivax Corp.*, 920 F. Supp. 1260, 1266 (S.D. Fla. 1995).

For purposes of a motion to dismiss, a complaint's factual allegations, though not its legal conclusions, must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On such a motion in a securities action, relevant public documents filed with the Securities and Exchange Commission may be considered for the limited purpose of determining what statements the documents contain—what was said, not whether it was true. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280–81 (11th Cir. 1999). Mr. Morse has acknowledged this. Hr'g Tr., ECF No. 42 at 27. This order sets out the facts based on these principles.

## II. Facts

SharpSpring provides marketing software to businesses. Prior to the transaction at issue, SharpSpring was an independent company whose shares were

publicly traded on NASDAQ.

The transaction at issue occurred in September 2021. Constant Contact, Inc. acquired all SharpSpring's stock for $17.10 per share. SharpSpring continued its operations, now as a Constant Contact subsidiary. The $17.10 price was 21% above the price at which the stock was trading when the Board of Directors approved the transaction, but Mr. Morse asserts that if a transaction of this kind was going to be entered at all, the price should have been higher.

### *A. SharpSpring's Performance Prior to the Transaction*

Mr. Morse asserts SharpSpring's stock performed well in the years before the transaction. But the complaint shows the performance was mixed. Beginning in January 2018, the stock price rose sharply. In late 2019, the price declined. The price slowly recovered and apparently peaked in mid-2020. It fell sharply in late 2020.

The performance of the company itself was documented in quarterly 10-Q reports filed with the SEC as required. *See* ECF Nos. 32-2 through 32-5. Each report included a section titled "management's discussion and analysis of financial condition and results of operations." *See, e.g.*, ECF No. 32-2 at 35 (capitalization altered). In its 2020 and 2021 quarterly reports, SharpSpring said the covid-19 pandemic impacted its business. *See* ECF No. 32-2 at 35; ECF No. 32-3 at 27; ECF No. 32-4 at 19; ECF No. 32-5 at 22.

The report for the first quarter of 2020 was filed on May 15, 2020. The report said the company implemented "strategic business decisions to help navigate these uncertain times," including reducing salaries, suspending bonuses, cutting costs, drawing on a line of credit, and obtaining federal aid. ECF No. 32-2 at 35–36. The company expected product demand to continue. *Id.* But the impacts of the pandemic on company performance could not be reasonably predicted. *Id.*

The report for the second quarter of 2020 was filed on August 14, 2020. The report again noted the impact of the pandemic. ECF No. 32-3 at 27. The company continued the cost-saving measures, delayed non-essential capital expenditures, and cut marketing costs. *Id.* The report noted a year-over-year decrease in new customers. *Id.* The company was optimistic that demand for its product would continue to grow, but again, the company warned that the extent to which the pandemic would impact the company could not be reasonably predicted. The report said the longer the pandemic continued, the greater the potential negative financial effect on the company. *Id.* at 28.

The 2021 reports became less optimistic. The first-quarter report was filed on May 17, 2021. The report said the pandemic was impacting SharpSpring's ability to generate new customers. ECF No. 32-4 at 19. In the first quarter of 2021, SharpSpring recruited 175 new customers compared to 314 new customers in the

Page 7 of 17

same period in 2020. *Id.* The report said the pandemic was creating a more competitive employment market and that this increased costs. *Id.*

The second-quarter report was filed on August 16, 2021. The report said SharpSpring was continuing to have difficulty recruiting new customers and added: "The resulting sales levels will have a continuing impact on the Company's growth rate throughout 2021 and beyond due to the Company's resulting revenue model." *Id.* at 23. In addition to the decrease in new customers, SharpSpring said its cost of business had increased. *Id.*

During these periods, SharpSpring reported year-over-year increases in revenue. *See* ECF No. 32-2 at 8; ECF No. 32-3 at 6; ECF No. 32-4 at 5; ECF No. 32-5 at 6 & 12–13. But SharpSpring also reported operating net losses.

SharpSpring held quarterly earnings calls with shareholders. The complaint alleges that in the 2020 and 2021 calls, SharpSpring's chief executive officer Richard Carlson projected confidence, said SharpSpring continued to perform well and was positioned for success, and said the pandemic would not impact SharpSpring's long-term growth. *See* Am. Compl., ECF No. 29 at 9–10. In a May 2021 earnings call, Mr. Carlson said SharpSpring was on track to achieve its long-term objective of $100 million in revenue and had a runway to growth. *Id.* at 13–14 ¶ 36.

***B. The Transaction***

In the third quarter of 2020, Mr. Carlson and a SharpSpring director, Scott Miller, began working to arrange a sale of the company.

Mr. Miller owned Greenhaven Road Investment Management, LP, an investment firm that owned 10.6% of SharpSpring's stock. Greenhaven began accumulating SharpSpring stock in 2017 when it traded for about $4 per share. In 2019, he said he was joining the SharpSpring Board to help the company navigate critical decisions including a potential acquisition. The complaint alleges Mr. Miller wanted a cash sale as an exit strategy for his investment firm. The complaint alleges that to ensure a cash sale, Mr. Miller solicited his associate Savneet Singh to join the Board. Mr. Singh was experienced in the technology sector as an investor and operator.

In January 2021, SharpSpring's management finalized financial projections for the 2021-22 year. On January 29, 2021, the Board met with management and approved the projections. At the same meeting, the Board agreed to pursue a sale of the company with an expected price of $20 per share. The Board decided not to pursue a stock-for-stock transaction. SharpSpring's independent financial advisor JMP Securities LLP contacted potential buyers, including Constant Contact.

On May 4, 2021, Constant Contact made an opening offer of $17 to $19 per share. The Board determined the offer was inadequate and ordered Mr. Carlson to

continue negotiations to obtain a higher price. On May 6, 2021, after considering an updated financial analysis created by JMP, the Board determined it should continue to seek a price above $19. Constant Contact refused to pay $20.

On May 23, 2021, SharpSpring's management, JMP, and the Board began discussing transaction details including directors' and officers' liability insurance and transaction-related bonuses. Mr. Miller and another director, Steven Huey, proposed the creation of a transaction bonus pool of $1.5 million, of which $1 million would be paid to Mr. Carlson. This was communicated to Constant Contact.

On June 2, 2021, Constant Contact made an updated offer of $17 per share with a $10 million dollar budget for transaction-related expenses and bonuses. The Board met and decided to counter at $17.25. The counter was either never communicated to Constant Contact or was rejected. *See* Am. Compl., ECF No. 29 at 23–24 ¶¶ 68–69. On June 3, 2021, Constant Contact offered to pay $17.10 per share. The proxy statement says—and Mr. Morse has not denied—that this was 25% above SharpSpring's closing share price of $13.65 on May 28, 2021. ECF No. 32-1 at 49.

On June 4, 2021, JMP presented an updated valuation analysis to the Board. The complaint contains no details on what the presentation contained or what the valuation analysis was.

Page 10 of 17

The complaint alleges that on June 4, 2021, the Board instructed management to create a new set of financial projections to be used for JMP's financial analysis and fairness opinion. The new projections reduced the predicted revenue and profit. JMP used the new projections to update its financial analysis, and JMP concluded the transaction was fair. On June 21, 2021, the Board approved the transaction. The proxy statement says the $17.10 price was 21% above the stock's closing price on that date.

The complaint alleges the June projections' downward revisions were not the result of solid financial practices but instead were created to justify the sale. The complaint alleges Mr. Miller's motivation was to cash out. The complaint alleges Mr. Carlson's motivation was the bonus and golden-parachute package he was slated to receive—and did receive—when the transaction closed. The complaint alleges JMP was motivated by the fee it would receive only if the transaction was consummated and that JMP thus did not provide an honest fairness opinion.

***C. The Proxy Statement and its Allegedly False Statements***

On July 29, 2021, SharpSpring issued a proxy statement to its shareholders. ECF No. 32-1. The statement ran a dense 101 pages, not including attachments. The statement described the proposed transaction and reasons for it. The statement said the Board's unanimous view was that the transaction was in shareholders' best

interest and should be approved. The statement included JMP's opinion that the transaction was fair. The shareholders voted to approve the transaction, and it was consummated.

Mr. Morse alleges the proxy statement included two material misrepresentations. The first, which came after a summary of the June projections, was part of the following passage, with italics added here to show the part that was allegedly false:

> These financial forecasts were based on numerous variables and assumptions that are inherently uncertain and may be beyond our control. *We believe the assumptions that our management used as a basis for financial forecasts were reasonable at the time made, and that the bases on which the financial forecasts were prepared reflected the best then-currently available estimates and judgments of management of the future financial performance of SharpSpring given the information our management had at the time.* The January 2021 Forecasts Materials were superseded by the Final Projections. Important factors that may affect actual results and cause the Final Projections not to be achieved include, but are not limited to, risks and uncertainties relating to our business (including our ability to achieve strategic goals, objectives, and targets over the applicable periods), industry performance, general business and economic conditions and other factors described in or referenced under "Forward Looking Statements" beginning on page 22 of "Reasons for the Merger; Recommendation of the Board of Directors" beginning on page 41, and those risks and uncertainties detailed in the Company's public periodic filings with the SEC. In addition, the forecasts reflect assumptions that are subject to change and do not reflect revised prospects for our business, changes in general business or economic conditions, or any other transaction or event that has occurred or that may occur and that was not anticipated at the time the financial forecasts were prepared. Accordingly, there can be no assurance that these financial forecasts will be realized or that our future financial results will not materially vary from these financial forecasts.

*See* ECF No. 32-1 at 62 (emphasis added).

The complaint identifies the second allegedly false statement as the "implied values per share of SharpSpring that JMP calculated" using the June projections. Am. Compl., ECF No. 29 at 36. The complaint does not quote any specific statement but cites pages 47 to 49 of the proxy statement. *Id.*

## III. Failure to State a Claim

In count one, the complaint asserts a claim against all defendants under Securities Exchange Act § 14(a) and Rule 14a-9. Count two is a derivative liability claim against the individual defendants under § 20. Both counts are based on the same two alleged falsehoods noted above.

As is uncontested, if the § 14(a) claim in count one fails to state a claim on which relief can be granted, so does the § 20 claim in count two. *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1276 (11th Cir. 2016) ("Control person liability is secondary only and cannot exist in the absence of a primary violation."); *Mizzaro v. Home Depot*, 544 F.3d 1230, 1237 (11th Cir. 2008) ("[A] plaintiff adequately pleads a § 20(a) claim only if the primary violation is pleaded.").

Under § 14(a) and Rule 14a-9, it is unlawful to issue a proxy statement containing a statement that, at the time and in the circumstances under which made, is false or misleading with respect to a material fact. *See* 15 U.S.C.

§ 78n(a)(1); 17 C.F.R. § 240.14a-9(a). The provision also applies to qualifying omissions.

***A. Allegedly False Statement of Belief in Projections***

The first allegedly false statement was essentially this: the directors believed the June projections were reasonable and were based on the best-available estimates of future performance.

The Securities Exchange Act has a safe harbor for forward-looking statements of opinion. *See* 15 U.S.C. §§ 77z-2(c) & 78u-5(c). Covered statements include projections of revenue, earnings, and future economic performance. 15 U.S.C. § 77z-2(i)(1)(A) & (C). To qualify, a projection must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from" the projection. *Id*. § 77z-2(c)(1)(A)(i). The proxy statements' projections were accompanied by sufficient cautionary statements and easily qualify for the safe harbor.

Mr. Morse asserts, though, that the directors did not actually *believe* the projections. A false statement of current *belief* in a projection is not a forward-looking statement of opinion but is instead a statement of present fact. Even so, this complaint falls short.

The controlling case is *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991). There, as here, the plaintiff asserted a § 14(a) claim based on a proxy

statement's allegedly false statement of the directors' belief. The Supreme Court said "proof of mere disbelief" does "not suffice for liability under § 14(a)." *Id.* at 1096. Instead, to recover under § 14(a) based on a false statement of current belief a plaintiff must "demonstrate something false or misleading in what the statement expressly or impliedly declared about its subject." *Id*. The Court concluded: "We therefore hold disbelief or undisclosed motivation, standing alone, insufficient to satisfy the element of fact that must be established under § 14(a)." *Id.*; *see also OmniCare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 n.2 (2015).

Mr. Morse's complaint fails to sufficiently allege anything "false or misleading" about the June projections. Under *Virginia Bankshares*, saying the directors did not believe the projections is not enough. The Board of Directors had approved more favorable projections in January, but SharpSpring had already fallen short of those projections; revising them before issuing a proxy statement was prudent. Mr. Carlson's oral comments in the May earnings call were more optimistic, at least in tone, but this, without more, does not call into question either management's June projections or the directors' belief in them. Mr. Miller's hedge fund had a substantial stake in SharpSpring, and he had expressed an interest in a cash sale, but he simultaneously noted the possibility of holding SharpSpring longer. The complaint does not sufficiently allege that bailing out too soon or for

too little was in the best interest of Mr. Miller or the other directors—or, more importantly, that this is what they did.

The transaction produced substantial payments to Mr. Carlson and other employees as an incentive to stay on with SharpSpring after the merger, but this hardly gave other directors an incentive to go forward. And it gave neither the directors nor Mr. Carlson an incentive to price the shares too low. In any event, as *Virginia Bankshares* teaches, motive, without more, is usually insufficient to support a § 14(a) claim that is based on a statement of current belief in future projections.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court said that when a complaint's factual allegations make its assertion of an actionable wrong no more plausible than an innocent alternative explanation, the complaint fails to state a claim on which relief can be granted. The Eleventh Circuit said the same thing in *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). Here the complaint's factual allegations make it no more plausible that the directors did not believe the June projections than that they did. The complaint fails to state a claim on this basis.

***B. Allegedly False Statement of Value***

The second alleged falsehood, not tied to a specific statement, was the implied value of the SharpSpring shares. Mr. Morse's assertion is that the June

projections were wrong and that, by using them, JMP produced a faulty price analysis and fairness opinion. The complaint's failure to identify a false statement, standing alone, would render this allegation deficient, but the allegation also falls short as a matter of substance.

The transaction price was more than 20% above the price at which the stock had been trading. Mr. Morse asserts the premium should have been higher, but a concerted effort to fetch a higher price—from Constant Contact or anyone else—failed. That one or more analysts thought SharpSpring had a higher upside does not show the directors believed the analysts rather than the markets and their own management's projections.

The complaint's factual allegations make it no more plausible that the directors did not believe the implied share value than that they did. The complaint fails to state a claim on this basis.

## IV. Conclusion

The first amended complaint fails to state a claim on which relief can be granted. This order thus grants the motion to dismiss. The order allows the plaintiff to file a second amended complaint if he chooses to do so. The plaintiff need not file a second amended complaint—and should not do so—merely to preserve the position that the first amended complaint states a claim and that this order is

incorrect. The plaintiff should file a second amended complaint only if he can allege additional facts that cure the deficiencies identified in this order.

IT IS ORDERED:

The motion to dismiss, ECF No. 30, is granted. The first amended complaint is dismissed. The plaintiff may file a second amended complaint by September 14, 2023.

SO ORDERED on August 14, 2023.

s/Robert L. Hinkle
United States District Judge