UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BRADFORD MORSE, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:21-cv-00209-RH-HTC |
| Plaintiff, | |
| -against- | |
| SHARPSPRING, INC., and RICHARD CARLSON, | |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Bradford Morse ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action on behalf of himself and all similarly situated former public stockholders of SharpSpring, Inc. ("SharpSpring" or the "Company") against SharpSpring and its former Chief Executive Officer and director Richard Carlson ("Carlson", and, together with SharpSpring, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-

9, 17 C.F.R. § 240.14a-9.

2.      Plaintiff's claims arise in connection with the all-cash acquisition ("Acquisition") of SharpSpring by Constant Contact, Inc., an online marketing tech company owned by private equity sponsors Clearlake Capital Group, L.P. and Siris Capital Group, LLC (collectively "Constant Contact") for $17.10 per share (the "Acquisition Consideration").

3.      On July 29, 2021, Defendants solicited shareholders into approving the unfair Acquisition by issuing a proxy statement (the "Proxy") that contained the following materially false or misleading statements or omissions (the "Proxy Misrepresentations").

     i.      "We believe the assumptions that our management used as a basis for financial forecasts were reasonable at the time made, and that the bases on which the financial forecasts were prepared reflected the best then-currently available estimates and judgments of management of the future financial performance of SharpSpring, given the information our management had at the time." (Proxy at 51). As set forth below, this statement was false because – among other things – SharpSpring had already prepared a set of Plan Projections (defined below) and further sensitized forecasts that factored in the ostensive rationales provided in the Proxy for the reduced forecasts later created in June 2021 to support

the fairness opinion by JMP Securities LLC ("JMP"). Based on public statements by Defendants, there were no business developments corroborating that the severe cuts made to the forecasts were justified by the Company's operating performance. Rather, Defendants slashed SharpSpring's forecast during the sale process after learning that Constant Contact's final offer would land lower than expected. The cuts were made not to better reflect the Company's business circumstances, but to create the figures needed to support a fairness opinion from JMP for the lower-than-expected offer.

ii.    That, subsequent to the Board's decision to have Carlson instruct JMP to request an increase in the acquisition consideration to $17.25 per share, "[r]epresentatives of JMP Securities communicated a request to representatives of Parent to increase the per share merger consideration." (Proxy at 39). This statement was materially *misleading* because it (falsely) implied that JMP correctly communicated the Company's end-stage counteroffer of $17.25 per share. However, as revealed by SharpSpring's June 4, 2021 board minutes, that is not what happened. Rather, JMP mistakenly counteroffered $17.10 per share. That counter was accepted by Constant Contact and became the final per-share consideration.

3

iii.   The Proxy was also materially *omissive* in connection with the above statement and the subsequent paragraph in the Proxy describing the Board's June 4, 2021 meeting (Proxy at 39-40). By withholding the facts that (a) JMP had sought $17.10 and not $17.25 in its counteroffer; (b) Carlson had declined at the Board's June 4, 2021 meeting to return to Constant Contact with a further $17.25 counteroffer; and (c) the Board had concurred with Carlson's declination, the Proxy failed to provide shareholders a candid explanation of a key end-stage error in the negotiations process and the Board's response to that error. In sum, the Proxy concealed that JMP had potentially left millions of dollars in consideration on the table. Instead of disclosing JMP's error forthrightly, Defendants chose prevarication.

4.   The Proxy Misrepresentations are false and misleading for reasons fully explained below. In short, Defendants misled shareholders into approving the unfair Acquisition by (i) having the Company downwardly revise SharpSpring's Plan Projections, which had been prepared in the ordinary course of business, to create unreasonably low financial forecasts (the "Fairness Opinion Projections") to achieve support for the desired fairness opinion from JMP; (ii) ordering JMP to use the Fairness Opinion Projections to perform the valuation analyses underlying its fairness opinion; (iii) including the above-identified material statement in the Proxy

that falsely represented the reasonableness of the Fairness Opinion Projections and misled shareholders regarding the Company's views of its prospects; and (iv) concealing JMP's mistaken end-stage counteroffer to Constant Contact to avoid disclosing that the Company had botched its last shot at maximining the Acquisition's value.

5.     Among other things, the Acquisition allowed Carlson – who maintained a sizable stake in SharpSpring worth 6.1% of the Company – to liquidate his shares. It also provided Carlson and other insiders with a self-serving $3 million "transaction bonus pool" payout for concluding the deal.

6.     The special meeting of SharpSpring shareholders to vote on the Acquisition (the "Shareholder Vote") was held on August 25, 2021 and resulted in the Company's misled shareholders approving the June 21, 2021 acquisition agreement. The transaction closed on September 1, 2021, cashing out SharpSpring's shareholders and denying them the ability to profit from the Company's future growth.

7.     For the foregoing reasons, and as set forth below, Plaintiff seeks to recover damages from Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 27 of

the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.    Personal jurisdiction exists over each Defendant. This Court has jurisdiction over SharpSpring because the Company has its principal place of business in the State of Florida. This Court has jurisdiction over Defendant Carlson because he conducted business in or maintained operations in this State at the times material hereto, serving as a director and CEO of SharpSpring, which maintained its principal place of business in this State. Additionally, Carlson committed violations of the Exchange Act within this State, and has minimum contacts with this District sufficient to render the exercise of jurisdiction over him by this Court permissible.

10.    Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391 because Defendants are found in or transact business in this District. Indeed, SharpSpring's executive offices are located in this District in Gainesville, Florida.

## PARTIES AND RELEVANT NON-PARTIES

### A.    Parties

11.    Plaintiff Bradford Morse was at all relevant times a shareholder of SharpSpring.

12.    Defendant SharpSpring, Inc. is a Delaware corporation with principal

executive offices located at 5001 Celebration Pointe Avenue, Gainesville, Florida 32608. Prior to the consummation of the Acquisition, SharpSpring's common stock traded on the NASDAQ under the ticker symbol "SHSP."

13.    Defendant Richard Carlson was at all relevant times the CEO and a director of SharpSpring. He founded SharpSpring in 2012 and owned approximately 6.1% of the Company prior to the Acquisition. After the consummation of the transaction, Carlson received nearly $8 million in golden parachute compensation, including approximately $1 million in previously non-existent transaction bonuses, and he continued with the post-closing Constant Contact as the Chief Product Officer.

### B.    Relevant Non-Parties

14.    Aaron Jackson ("Jackson") was at all relevant times the Chief Financial Officer of SharpSpring. After the consummation of the Acquisition, Jackson received approximately $1.06 million in golden parachute compensation, including a $150,000 transaction bonus. He continued with the post-closing Constant Contact as its Accounting Vice President and Corporate Controller.

15.    Scott Miller ("Miller") was appointed a director of SharpSpring effective August 20, 2019 and is a founder and owner of Greenhaven Road Investment Management, LP (d/b/a Greenhaven Road Capital) and its affiliated entities ("Greenhaven"), which owned 10.6% of SharpSpring stock prior to the

Acquisition. Miller was appointed to SharpSpring's Board on August 20, 2019, after prior director Daniel Allen resigned from the Board. Miller was simultaneously appointed chairperson of SharpSpring's Nominating and Corporate Governance Committee, a role previously filled by Daniel Allen.

16.    Savneet Singh ("Singh") was appointed a director of SharpSpring effective August 17, 2020. Singh assumed the directorship from former director Marietta Davis, who had resigned that same day. Singh was simultaneously appointed chairperson of the Company's Compensation Committee, a post previously held by Davis. Singh is also the President and CEO of PAR Technology Corp., a top holding of Greenhaven, and is a known associate of Miller.

## SUBSTANTIVE ALLEGATIONS

### A.    SharpSpring's Business Model and Financial Background

17.    Prior to the Acquisition, SharpSpring was a growing provider of a cloud-based marketing automation platform used by advertising agencies and other businesses. The platform provided customers with an integrated, user-friendly interface for managing and automating marketing and sales operations, allowing businesses to substantially reduce the workload involved in marketing and sales related tasks. Access to the platform was sold on a subscription model, allowing the company to grow its revenues as its subscription base expanded. Approximately 250

employees worked for the Company in 2020.[1]

18.    The Company's platform offered tools for automating and managing advertising campaigns, customer relationships, email and phone communications, social media accounts, and the collection of customer data. Additional features – among numerous others – include chatbots, shopping cart functions, and form-filling programs, as well as data analysis tools that customers could use to analyze the information resulting from SharpSpring's functions. The platform could also be linked to a wide array of third-party applications.

19.    According to Carlson in earnings calls, the platform tended to "deeply embed" itself in clients' business operations. "[Its functions] were integrated into [a client's] website in countless ways, including forms, landing pages, dynamic content, and automated triggers and workflows." The platform also "houses all of [a client's] email lists . . . email templates . . . and email[s]," and is "generally either integrated with a shopping cart, a third party [customer relationship management system]" or "[SharpSpring's own customer relationship management] capability."

20.    Before the Acquisition, the Company had 1,900 advertising agency customers and 500 "direct" customers using the platform for marketing on their own behalf. Inclusive of the clients of ad agency customers, approximately 10,000

---

[1] SharpSpring's platform now exists as Constant Contact's "Lead Gen & CRM" platform.

businesses relied on SharpSpring's platform.

21.    Amongst these customers, the Company was known for its innovative, expanding tool set, strong customer support, and attractive price point – making its platform an increasingly popular choice for its core customer base of digital marketing agencies and online businesses.

22.    SharpSpring's financial performance leading up to the Acquisition reflected the utility it offered to customers and positioned the Company to deliver long-term growth to shareholders. From 2018 to 2020 – the three-year period of financial results prior to announcement of the Acquisition – revenues climbed from $18,651,525 to $29,287,882 and gross profit climbed from $12,853,256 to $21,225,318.

|  | 2018 | 2019 | 2020 | CAGR[2] |
|---|---|---|---|---|
| **Revenue** | $18,651,525 | $22,699,386 | $29,287,882 | 25.31% |
| **Gross Profit** | $12,853,256 | $15,556,970 | $21,225,318 | 28.5% |

23.    According to Defendant Carlson in the earnings call for Q1 2021 held in May 2021, the month prior to the Acquisition, SharpSpring "ha[d] a clear runway to growth simply by layering on customer cohorts that behave[d] just like the ones [it had] been layering on for upwards of seven years[.]"

---

[2] CAGR, or "compound annual growth rate", is the annualized rate of change for a metric over a certain time period.

24.    Carlson reiterated his expectations about the Company's prospects in SharpSpring's Q1 2021 press release, stating that the business "remain[ed] on the path to achieving our long-term $100 million [annual recurring revenue] target[.]"

**B.    Defendants Created and Approved the Materially Reduced Fairness Opinion Projections to Justify the Unfair Acquisition Consideration That Resulted from a Flawed and Conflicted Sales Process**

25.    Notwithstanding SharpSpring's positive long-term outlook, Defendant Carlson self-servingly collaborated with director Miller behind the scenes from Q3 2020 to Q1 2021 to position the Company for a sale, which would allow him to liquidate the 6.1% stake he had accumulated in SharpSpring as its founder.

26.    Miller owned 10.6% of the Company through Greenhaven Road Investment Management, LP ("Greenhaven"), his hedge fund, and had gained his seat on the Board in August 2019 after a prior board member stepped down – a repeated pattern for SharpSpring during the Acquisition process. Miller's 10.6% interest made him SharpSpring's largest owner, and the Company in turn was one of Greenhaven's top five holdings.

27.    Greenhaven started accumulating its stake in SharpSpring by 2017, when the Company's share price hovered at around $4. As Miller indicated in his fund's Q3 2018 investor letter, the investment had been based on the Company's track record of growth, but with the awareness that merger and acquisition activity in the sector could be used to allow Greenhaven to exit its investment at a premium:

SharpSpring has become a Top 5 holding through a combination of price appreciation and the purchase of additional shares over several months. SharpSpring is a SaaS (Software as a Service) business that provides marketing automation software primarily for digital marketing agencies who utilize their technology to run sophisticated digital campaigns that include web pages customized based on a visitor's historical activity. […]

SharpSpring has benefitted from multiple expansion, but also has executed well. Product revenue grew 40% in their last reported quarter. In a more recent press release, the company announced a record number of new customers in Q3 while maintaining marketing efficiency (their LTV/CAC should remain above 6). *There is a very long runway for growth for SharpSpring.* The company will benefit from secular tailwinds in an industry growing over 20% per year. *There is also a history of acquisitions in the space at premiums to where shares trade today.* SharpSpring came to my attention through a conversation with Jeremy Kahan of North Peak[.]

28.    Based on Greenhaven's shareholder letters, its typical investment horizon is three to five years. Due to the size of Greenhaven's investment in SharpSpring, however, Greenhaven's most viable exit strategy was a cash deal – regardless of the prospect of greater value achievable for other shareholders through standalone growth.

29.    By late 2019, Miller was ready to liquidate his interest in SharpSpring through an acquisition and began seeking to take an active role in steering the Company's strategy. For example, in Miller's Q2 2019 investor letter for Greenhaven issued prior to his appointment to SharpSpring's board, Miller adverted to his plan to join the Board and pursue a sale of the Company:

The simple heuristic is that meetings are bad, but *I have come to believe*

*that being involved on the board of SharpSpring could be very beneficial*. First, I believe that it can lead to better returns for our fund by giving us a seat at this company's capital allocation table. *SharpSpring has to make critical decisions among growth, capital preservation, and capital raising. The answers are not obvious. I would like a role in helping to flesh out those decisions and communicating them to shareholders. In addition, there have been more than a dozen acquisitions of marketing technology companies including Adobe's acquisition of SharpSpring direct competitor Marketo at 12X revenue. A similar multiple would imply well in excess of 200% return for current SHSP shareholders. I believe that SharpSpring has an attractive opportunity in front of it*, and not selling may also be a very smart decision. I think our partnership would benefit if we had voice at the table.

30.    In August 2020, Miller took a more direct approach to push for a sale and handpicked his known associate, Singh, to join the Board. Singh would assist the efforts to have SharpSpring sold.

31.    Singh is the President and CEO of PAR Technology Corp., one of Greenhaven's primary holdings. Moreover, in Greenhaven's investor letter for Q3 2020, Miller expressly confirmed that he was responsible for Singh's appointment to the Board:

I have always respected PAR CEO Savneet Singh, who is an A player in my book. He has experienced the technology sector as an investor and operator, and has an outstanding network. From my position as a member of the SharpSpring board of directors, I reached out to Savneet to see if he had any recommendations of people in his network when it became clear that we needed to add a new director. To my pleasant surprise, he indicated that he himself might be interested as a way to stay tapped into the industry outside of the technology/restaurant-centric world he was currently operating in. After a series of approvals, Savneet joined the SharpSpring board this summer.

32.    Within days of Singh's appointment to the Board, SharpSpring met with investment bankers and instigated its acquisition process.

33.    Miller expressed his preference for a cash deal early on in negotiations and enforced that preference throughout the process. For example, Miller inserted himself directly into the negotiation process – despite being neither a member of management nor the Chairman of the Board – to dissuade an early bidder seeking a stock deal from continuing in the sales process. In fact, Miller was the only outside director to directly participate in any acquisition negotiations.

34.    In late October 2020, JMP (the Company's financial advisor) presented its preliminary valuation of the Company and a timeline for the sales process.

35.    During this same time period, Company management was finalizing its financial projections for 2021-2022. Interestingly, on January 19-21, 2021, Company management met with JMP to discuss the financial projections before receiving approval or even meeting with Board.

36.    On January 29, 2021, Company management met with the Board to discuss SharpSpring's business conditions and the Company's ordinary-course financial projections for 2021-2022 based on management's understanding of those conditions. This discussion covered both the upsides and the operating challenges facing the Company incorporated into the assumptions underlying the projections. Crucially, with regards to the Company's challenges, management informed the

Board that new customer sales for the fourth quarter of 2020 were below the Company's 2020 budget by 41%, due primarily to the impact from Covid; that the resulting sales levels would have a continuing impact on the Company's growth rate in 2021; that customer acquisition costs had increased above what was anticipated in the Company's 2020 budget; and that the remote work environment had added upward pressure on salaries.

37.    Notably, these operating challenges were not a surprise to the Company. For instance, in public statements in the Company's earnings call on November 10, 2020, Carlson discussed that SharpSpring had experienced a slowdown in customer acquisition. Likewise, related to the Company's salary costs, Carlson stated that the Company had chosen to restore its employees' salaries to pre-Covid levels. And in the earnings call for the quarter ended December 31, 2020, Carlson noted that SharpSpring intended to increase its customer acquisition costs to increase its revenue. I.e., SharpSpring's increasing customer acquisition costs were planned.[3]

---

[3] Carlson (Q4 2020 earnings call): "As I mentioned in our comments, we cut back on some sales and marketing based on our balance sheet at the time of the pandemic and so forth. And so, if I compare our spend, our anticipated spend, compared to what we were doing last year, I mean, just to be frank about it, it's about double. We intend to double our marketing spend year over year. That is to say we intend to double our marketing spend on programs that initiate leads into the top of our funnel. I don't mean to imply we intend to double our overall sales

38.     Following the above-described discussion at the January 29 meeting, the Board approved management's financial projections for 2021-2022 (the "Plan Projections" denominated in the below chart). The Plan Projections and three further sensitized cases were summarized in the Proxy as follows.[4]

#### 2021 Budget Forecast[(1)]

##### In millions

|  | COVID-19 | Downside | Plan | Stretch |
|---|---|---|---|---|
| Net Revenue | $ 33.3 | $ 34.9 | $ 37.4 | $38.5 |
| Gross Profit | 24.9 | 26.5 | 28.8 | 29.9 |
| Operating Income | (11.4) | (11.0) | (10.7) | (9.8) |
| Adjusted EBITDA | (8.2) | (7.8) | (7.4) | (6.6) |

(1)   In connection with the preparation of the January 2021 Budget, our management also prepared, on a preliminary basis, forecasted financial information for 2022. The forecast for 2022 was prepared based on preliminary assumptions, and, as a result, the forecasted information is highly uncertain and is likely to change significantly based on updated assumptions and information. Under the preliminary 2022 budget, management forecasted, at Plan scenario, Net revenue of $45.8 million, Gross profit of $35.6 million, Operating income of $(10.5) million, and Adjusted EBITDA of $(7.2) million.

39.     When the Plan Projections were prepared, SharpSpring thus had a solid understanding of the Company's near-term prospects and operating difficulties, and management's beliefs regarding these matters were incorporated into the Plan Projections.

40.     In external, public communications subsequent to the creation of these internal forecasts, SharpSpring used revenue guidance for 2021 of $34 to $36

_____

and marketing line item within our budget, but rather doubling the program spend."

[4] The figures for 2022 in the Plan Projections are contained in footnote 1 to the chart.

million.

41.     At this same meeting on January 29, 2021 where the Plan Projections were approved by the Board, the Board agreed to pursue an outright sale of the Company, as opposed to any other strategic transaction, with expectations of a $20 per share selling point. Shortly thereafter, JMP reached out to several parties and discussions ensued.

42.     Reading the writing on the wall, SharpSpring's longest standing Board member, and chair of the Audit Committee, David A. Buckel, decided not to stand for re-election to the Board. Mr. Buckel's departure represented the second jettison of an established SharpSpring Board member since the commencement of the sales process. To replace Mr. Buckel, Miller appointed Jason Costi to his first-ever board of directors seat. By joining the Board at the eleventh hour, Costi had little to no skin in the game and therefore little personal incentive to resist a sale that fell short of delivering adequate value.

43.     In March 2021, JMP initially reached out to Constant Contact.

44.     Meanwhile, on March 16, 2021, SharpSpring reported positive financial results for Q4 2020 and the full year of 2020. As referenced above, SharpSpring predicted that the Company would achieve $34-36 million in revenue in 2021:

**2021 Financial Outlook**

For the fiscal year ending December 31, 2021, SharpSpring expects total revenue to range between $34 million and $36 million. The Company's guidance is based on recurring revenue from its current customer base and performance results tracked through February of this year. These expectations include the impact of increased sales and marketing spend that began in January 2021 which will support a related revenue ramp as the year progresses.

45.    On May 4, 2021, Constant Contact made an opening offer of $17-$19 per share – well below the Board's $20 expectation. The Board met that same evening to discuss. Deciding that even the high end of Constant Contact's offer range was inadequate, the Board instructed Carlson to continue negotiations to obtain a price above Constant Contact's indicated range.

46.    Two days later, the Board held a special meeting with JMP. At that meeting, JMP provided an updated presentation of its preliminary valuation analyses. Based on this presentation, the Board determined that its decision on the evening of May 4th to seek a price higher than $19 per share was correct.

47.    On May 10, 2021, management met with the Audit Committee of the Board and affirmed its belief that SharpSpring was on track to meet its financial guidance. Specifically, management stated that it continued to believe the Company could achieve $34 to $36 million of total revenue for the year ending December 31, 2021, consistent with the guidance that it previously provided in connection with its 2020 earnings report in March 2021 and ***above*** the ultimate $33.4 million 2021 net

revenue figure included in the Fairness Opinion Projections.

48.    On May 11, 2021, Constant Contact indicated that it was not willing to meet the Board's $20 per share price and would not offer more than its $17-$19 range. This should have been the end of discussions. Since the Board, JMP, and Company management had all indicated that the fair value of the Company was greater than Constant Contact's proposed range, the Company should have been unwilling to accept a deal that failed to adequately compensate shareholders for SharpSpring's value.

49.    On May 13, 2021, SharpSpring issued a press release reaffirming the $34 to $36 million 2021 revenue range provided in March and stating the range was based on recurring revenue from SharpSpring's current customer base and performance results tracked through April 2021, demonstrating that the Company had performed within management's expectations thus far in the year.

**2021 Financial Outlook**

For the fiscal year ending December 31, 2021, SharpSpring expects total revenue to range between $34 million and $36 million. The Company's guidance is based on recurring revenue from its current customer base and performance results tracked through April of this year. These expectations include the impact of increased sales and marketing spend that began in January 2021, which will support a related revenue ramp in the second half of the year.

50.    Also on May 13, 2021, Defendant Carlson conducted SharpSpring's quarterly earnings call for Q1 2021, where he made numerous positive comments

regarding SharpSpring's then-current performance, including with respect to its sales (which were in March "more than double" January's figure) and customer attrition (which had reached the lowest level ever seen by the company).

- "We're seeing sales acceleration. As I mentioned in Q1, **March's sales were literally more than double what we saw in January**. So that recovery in quarter is strong and happening. And so these are the reasons why I think it's the incremental effect of all of those that give us confidence that we're going to see a solid year here."

- "Early indicators have been very positive thus far. Even during Q1, sales climbed sequentially each month with **sales in March more than doubling the sales we saw in January**."

- "[T]he solid progress we made in each month within the quarter gives us confidence that the new customer adds will return to pre-pandemic levels as the year progresses and our spending begins to take full effect." (Tr. 7)

- "I…indicated [in our prior earnings call] that after our successful capital raise at the very end of last year, we would begin implementing increased sales and marketing initiatives in Q1, which would ultimately lead to a healthy new sales growth in later quarters. I'm happy to report that those plans have now begun to take shape[.]"

- "We just had the best [customer] attrition month we've ever seen at 2.18%"

- "We…had our best month in terms of [customer] attrition that we've had in, I think, our history."

- "[O]ur continually improving [customer] attrition performance has affected our net revenue retention as well. More specifically, during the first quarter of the year, we achieved a 94.4% year-over-year net revenue retention, which compares to a 91.7% year-over-year net revenue retention in the first quarter of 2020. We believe this strong performance, immediately following a price increase at the beginning of the year, is based on the overall value that customers see in the platform[.]"

- "[O]ur current customers are behaving as we need them to in order to achieve our long-term objective of reaching $100 million in revenue."

51.    CFO Carlson also spoke favorably about SharpSpring's ability to attract and retain employees, noting that the Company's recent "key hires" included a "super-seasoned SaaS veteran" and describing the Company's employees as "accomplished", "dedicated", and "highly motivated to make a difference".

52.    Thus, the Company's public statements through May 2021 – **the month prior to announcement** – show that SharpSpring continued to perform strongly and within management's expectations, and the Company continued to predict that its revenue would range from $34-36 million for the year.

53.    On May 23, 2021, Company management, JMP, and the Board began discussions regarding transaction consummation details, including directors' and officers' liability insurance and transaction-related bonuses. Miller and Huey met to discuss the creation of a transaction-related bonus pool to induce members of Company management to support the forthcoming cash-out. Notably, Singh – the nominal chair of the Compensation Committee – was not present for this discussion despite his putative oversight regarding compensation.

54.    By May 30, 2021, Miller proposed the creation of a transaction bonus pool in the aggregate amount of $1.5 million, $1.0 million of which would be payable directly to Carlson, to incentivize management to close the forthcoming Acquisition. The next day, this information was communicated to Constant Contact,

and the parties began arranging the timing of the transaction before even settling on a price.

55.    On June 2, 2021, Constant Contact made an offer of $17 per share – a value at the very bottom of a range that had already been deemed insufficient at its highest point. Instead of rejecting Constant Contact's wholly inadequate offer, Defendants doubled down on their efforts to consummate a cash sale.

56.    After receiving the lowball $17 offer, the Board met with management to discuss the bid.

57.    According to the Proxy, the Board decided to counter that $17 offer with an offer of $17.25, and for Defendant Huey to instruct Defendant Carlson to obtain JMP's viewpoint on the potential risk associated with a counteroffer and, assuming the risk was modest, to proceed (with the assistance of JMP) with a request to Constant Contact to increase the proposed consideration to $17.25 per share and double the transaction bonus pool from $1.5 million to $3 million.

58.    Also according to the Proxy, on the evening of June 2, 2021 and the morning of June 3, 2021, JMP communicated a request to representatives of Constant Contact to increase the per share consideration, and on the evening of June 3, 2021, Constant Contact agreed to increase the proposed price per share to $17.10. The Proxy further states that representatives of JMP subsequently requested from representatives of Constant Contact an additional increase in the price per share to

$17.25, which representatives of Constant Contact declined.

59.    However, SharpSpring's internal documents tell a different tale than the Proxy. Based on the information made public through the Delaware Chancery Court trial, including SharpSpring's board minutes,[5] JMP only requested an increase in the consideration to $17.10, rather than the $17.25 counteroffer authorized by the Board.

60.    The minutes for the June 4, 2021 Board meeting state as follows:

Based on instructions from Mr. Huey following the June 2, 2021 Board meeting, Mr. Carlson had discussed with JMP the proposal to request that [Constant Contact] increase the merger consideration to $17.25 per share and, as a separate and distinct request, to agree to a transaction bonus pool of $3.0 million. After a series of discussions among Mr. Carlson and JMP regarding the proposed request, JMP confirmed to Mr. Carlson and the Board its intention to request that [CCI] increase the purchase price by approximately $1.5 million, and to adjust assumed transaction expenses to include an incremental $1.5 million of transaction bonuses for Company employees, stating its view that such request would not materially put the overall transaction at risk. With the affirmation of the Board, JMP proceeded with the request. **Mr. Carlson noted that, based on a misunderstanding on the part of JMP, JMP proceeded to request an increase in the merger consideration to $17.10 per share, rather that the higher amounts previously discussed. Based on his understanding that [CCI] had already discussed and received approval to increase the price to $17.10 per share Mr. Carlson believed that going back again to**

_____

[5] *Hightower v. SharpSpring, Inc.*, No. 2021-0720-KSJM, 2022 Del. Ch. LEXIS 214 (Del. Ch. Aug. 31, 2022) was an action in the Court of Chancery of Delaware where the plaintiff sought to compel inspection of books and records under 8 Del. C. § 220 ("Section 220"). On May 24, 2022, the parties in that action had a trial before Chancellor Kathaleen St. Jude McCormick during which the previously confidential contents of SharpSpring's Board Meeting Minutes became publicly available information. *Id.*

**request an increase to $17.25 would potentially jeopardize the willingness of [Constant Contact] to proceed, so he declined to do so. JMP received the Revised Proposal later in the day. A discussion followed during which the independent members of the Board concurred with Mr. Carlson's conclusion not to make an additional request.**

61. Misleadingly, and as fully challenged below, the Proxy attempted to use non-descript language ("a request to representatives of Parent to increase the per share merger consideration") to avoid informing shareholders of this significant mistake by JMP.

62. Similarly, the Proxy misleads shareholders in its description surrounding the decision to double the size of the transaction bonus pool on June 2, 2021. The Proxy indicates that decision was made separately by independent members of the Board in executive session. However, according to the documents cited during the Section 220 trial, Defendant Carlson expressed his desire for an increased bonus retention pool in recognition of his incremental work in connection with the sales process.

63. These characterizations of the mistakes and self-interested decisions made by SharpSpring's key negotiators during the critical time period when the Acquisition Consideration was being finalized demonstrates that the Proxy was designed to procure shareholder support for the Acquisition by withholding crucial information about JMP's error, not provide a full and fair description of JMP's mistake and the Board's subsequent actions.

64.    On June 4, 2021, JMP presented an updated valuation analysis. Immediately after this presentation, the Board instructed Company management to create a new set of forecasts – the Fairness Opinion Projections – that were lower than the Plan Projections and even the Downside case, which the Company had already prepared to reflect a more pessimistic outlook for the Company than the Plan Projections.

65.    However, the business conditions the Proxy references to rationalize the cuts made in the Fairness Opinion Projection were already understood and conveyed to the Board when the Plan Projections were formulated in January 2021, including the Company's sales, revenue, and salary cost difficulties. This point is further discussed below.

66.    The new forecasts would be used solely for JMP's financial analyses in support of its fairness opinion.

67.    Over the next 10 days, Defendants worked on reducing the Company's financial projections and providing a final set of lower projections to JMP that JMP could use to find the Acquisition Consideration "fair" to SharpSpring shareholders.

68.    On June 15, 2021, Defendants and Company management met with JMP to review the Fairness Opinion Projections. Once again, it is important to note that management went directly to JMP before presenting the projections to the Board.

25

69.    On June 17, 2021, Defendants provided the Fairness Opinion Projections to the Board. These Projections were summarized in the Proxy as follows:

### Summary of Projected Financial Information

*In millions*

| | FY2021E | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E |
|---|---|---|---|---|---|---|
| **Net Revenue** | $ 33.4 | $ 41.4 | $ 51.2 | $61.8 | $73.2 | $86.9 |
| *Growth %* | *14.1%* | *24.0%* | *23.6%* | *20.7%* | *18.4%* | *18.8%* |
| Less: Cost of Sales | $ 7.8 | $ 9.0 | $ 10.4 | $12.1 | $14.1 | $16.4 |
| **Gross Profit** | $ 25.6 | $ 32.4 | $ 40.8 | $49.6 | $59.1 | $70.6 |
| *% Margin* | *76.7%* | *78.3%* | *79.6%* | *80.3%* | *80.7%* | *81.2%* |
| Less: Operating Expenses | $ 38.7 | $ 46.1 | $ 50.3 | $55.3 | $61.5 | $68.5 |
| **Operating Income** | ($ 13.0) | ($ 13.6) | ($ 9.5) | ($ 5.6) | ($ 2.5) | $ 2.0 |
| *% Margin* | *(39.0%)* | *(32.9%)* | *(18.5%)* | *(9.1%)* | *(3.4%)* | *2.4%* |
| Plus: Depreciation and Amortization plus Equity Compensation | $ 3.6 | $ 3.6 | $ 3.8 | $ 4.0 | $ 4.2 | $ 4.2 |
| **Adjusted EBITDA** | ($ 9.4) | ($ 10.0) | ($ 5.7) | ($ 1.6) | $ 1.8 | $ 6.3 |
| *% Margin* | *(28.2%)* | *(24.2%)* | *(11.1%)* | *(2.6%)* | *2.4%* | *7.2%* |
| Less: Taxes | — | — | — | — | — | — |
| Less: Capital Expenditures | (0.4) | (0.5) | (0.6) | (0.8) | (0.9) | (1.1) |
| (Increase) / Decrease in Net Working Capital | 0.2 | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) |
| **Free Cash Flow** | ($ 9.6) | ($ 10.7) | ($ 6.5) | ($ 2.6) | $ 0.7 | $ 5.0 |
| *% Margin* | *(28.8%)* | *(25.8%)* | *(12.7%)* | *(4.2%)* | *0.9%* | *5.7%* |

70.    The next day, on June 18, 2021, JMP presented updated financial analyses to the Board utilizing the Fairness Opinion Projections for their "contemplated" fairness opinion. Only after reviewing the banker-approved Fairness Opinion Projections, and confirming that the downward manipulated numbers served their purpose of securing a fairness opinion, did the Board authorize their use.

71.    Three days later, the Board and JMP repeated their dance from the successful dress rehearsal, and the Board approved the Acquisition, despite knowing

it represented inadequate value for SharpSpring shareholders.

72.    The Fairness Opinion Projections represented a severe downgrade to the legitimately prepared Plan Projections that was incompatible with the Company's financial results (as outlined above) and inconsistent with SharpSpring's publicly-expressed optimism regarding its future prospects. As noted above, SharpSpring continued to affirm that it expected to achieve its revenue guidance for the year up to the month prior to announcement. That public guidance was never reduced.

73.    As shown below, the Fairness Opinion Projections cut SharpSpring's revenue forecasts by **10.7% (in 2021) and 9.6% (in 2022)** and slashed its EBITDA forecasts by **27% (in 2021) and 39% (in 2022)**. These are the figures that are directly comparable to those used in the Plan Projections, which covered 2021-2022.

| | | 2021 | 2022 |
|---|---|---|---|
| **Revenue** | Plan Projections | $ 37,400,000 | $ 45,800,000 |
| | Fairness Opinion Projections | $ 33,400,000 | $ 41,400,000 |
| | **% Change** | **-10.70%** | **-9.61%** |
| **Gross Profit** | Plan Projections | $ 28,800,000 | $ 35,600,000 |
| | Fairness Opinion Projections | $ 25,600,000 | $ 32,400,000 |
| | **% Change** | **-11.11%** | **-8.99%** |
| **Operating Income** | Plan Projections | $ (10,700,000) | $ (10,500,000) |
| | Fairness Opinion Projections | $ (13,000,000) | $ (13,600,000) |
| | **% Change** | **-21.50%** | **-29.52%** |
| **Adjusted EBITDA** | Plan Projections | $ (7,400,000) | $ (7,200,000) |
| | Fairness Opinion Projections | $ (9,400,000) | $ (10,000,000) |
| | **% Change** | **-27.03%** | **-38.89%** |

74.    These cuts mattered to shareholders because of their impact on JMP's valuation analyses and because of what they told shareholders about the health of SharpSpring's business.

75.    The cut to ***adjusted EBITDA*** is significant here because adjusted EBITDA is used to derive a company's unlevered free cash flow, a key input used to calculate a company's present value in a discounted cash flow ("DCF") analysis. DCF analysis is a critically important valuation method in contemporary corporate finance[6][7][8], and it was used to calculate SharpSpring's value here by JMP.

76.    The cut to ***revenue*** is significant because JMP's DCF analysis[9] used a revenue-based exit multiple to calculate the Company's terminal value (rather than

---

[6]    "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[7]    "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.

[8]    "In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014.

[9]    Summarized in the Proxy at page 47.

a perpetuity growth rate applied to the Company's 2026 unlevered free cash flow), rendering the Company's 2026 revenue a further key input in JMP's DCF analysis.

77.    As the technique's name suggests, a DCF analysis calculates the value of a business based on (among other things) the present value of the business's projected future free cash flows. The basic inputs in a DCF analysis are (i) a forecast period of estimated unlevered free cash flows, which here extends to 2026; and (ii) a calculation of the business's terminal value subsequent to the forecast period derived by either (a) applying a perpetuity growth rate to the company's terminal unlevered free cash flow or (b) applying an "exit multiple" to a financial metric in the business's final projections year. Here, JMP used an exit multiple method – technique "b". A discount rate (typically derived from an analysis of the company's cost of capital) is also applied to the company's future cash flows to calculate their present value.

78.    As indicated above, the downward revisions in the Fairness Opinion Projections to **revenue** would have cut SharpSpring's ultimate present value by specifically cutting the Company's terminal value. All other things being equal, the cut to near-term revenue would have cut final-year revenue due to the mathematical effects of compounding: cuts to metrics used in early years reduce the value of later-year figures even where the growth rates seen in later years appear to normalize.

79.    For similar reasons, the downward revision to the Company's

unlevered free cash flows in 2021-2022 would have cut the present value of the projections period, with the 2021-2022 reductions likewise negatively impacting 2023-2026 unlevered free cash flow due to compounding.

80.    In addition, the Fairness Opinion Projections reduced SharpSpring's value in JMP's public company analysis because that further analysis calculated SharpSpring's value as a multiple of the Company's 2021 and 2022 expected revenue. Because these revenue metrics were reduced by 10.7% for 2021 and 9.6% for 2022 relative to the Plan Projections, the Fairness Opinion Projections cut the Company's per share value under this analysis, which would have otherwise used the revenue figures in the Plan Projections.

### C.    The Reductions Made in the Fairness Opinion Projections were Objectively Unreasonable

81.    As Defendants knew, the Fairness Opinion Projections were unreasonably low and presented an objectively false and misleading picture of SharpSpring's financial prospects for several reasons.

82.    First, the cuts were objectively unreasonable because – as set forth above – SharpSpring continued to perform in line with management's expectations through May 2021. SharpSpring never reduced its publicly-stated revenue guidance for the year, and Defendants continued to make positive public statements regarding the Company's performance thus far in 2021 and the Company's longer-term prospects.

83.    Second, the purported reasons that the Proxy uses to justify the cuts made

in the Fairness Opinion Projections were already known and accounted for in the Plan Projections, and worsening performance past the Company's expected difficulties was already captured by the sensitized Downside case to the Plan Projections, which were *__higher__* than the figures used in the Fairness Opinion Projections. For instance, in January 2021, SharpSpring's management and Board was *__aware__* that the Company's sales to new customers were below the Company's Q4 2020 plan by approximately 41%, that sales levels would have a continuing impact on the Company's revenue growth rate in 2021, that customer acquisition costs had increased, and that there was upward pressure on employee salaries. The Proxy explicitly states that the Board approved the Plan Projections based on the Board's views of these business conditions. Thus, the Proxy's use of these difficulties to justify the cuts in the Fairness Opinion Projections is purely pretextual. The rationale advanced in the Proxy is also contradicted by Carlson's and CFO Jackson's numerous optimistic statements during the earnings calls and press releases in the leadup to the Acquisition, which demonstrated that the Company was closely tracking the expectations management had expressed to the Board on January 29, 2021.

84.    Third, the Fairness Opinion Projections were objectively unreasonable because the cuts they contained were out of proportion to or inconsistent with the metrics that could have potentially been used to justify them. For instance, while the

31

Proxy references a 4% revenue shortfall in Q1 2021 relative to the Plan Projections, the revenue forecast in the Fairness Opinion Projection was cut by more than double that – by 10.7%, not 4%. Similarly, in the Company's May 2021 earnings call, Carlson reported that the Company had just experienced its lowest-ever customer attrition month, at 2.18%. Since the Proxy discloses that the Plan Projections assumed customer attrition of between 2.25% and 3.0%, the Company's performance in 2021 thus *exceeded* the Plan Projections' assumptions in this relevant respect.

85.     Fourth, the Fairness Opinion Projections were objectively unreasonable because they did not incorporate Carlson's belief – expressed in the Company's May 2021 earnings call – that SharpSpring would reach $100 million in annual recurring revenue and that the Company's customers were behaving as needed to render that objective achievable. Rather, the Fairness Opinion Projections ended in 2026 at $86.9 million.

86.     Fifth, the Fairness Opinion Projections were objectively unreasonable because they were created outside of the ordinary course of SharpSpring's business and with knowledge that the Acquisition Consideration would be $17.10. Indeed, the Board only authorized the use of the Fairness Opinion Projections on June 18, 2021, after confirming with JMP that the downwardly manipulated metrics were adequate to secure a fairness opinion.

87.    Companies normally create forecasts in the ordinary course of business to help them plan their future. Consequently, ordinary course forecasts are created with the expectation that they will be relied on for future business decisions. This expectation of future reliance strongly incentivizes the creation of accurate forecasts: decisionmakers understand that inaccurate, unreliable forecasts will lead to poorly informed and potentially damaging decisions.

88.    In contrast, forecasts created during a sale process are prepared with the expectation that a company's standalone existence will soon come to an end. There is no expectation of future reliance in future business decision-making. Rather, the forecasts solely serve to create inputs for valuation analyses prepared by an external financial advisor.

89.    In addition, where – as here – an acquiror's final bid is already known at the time that a financial forecast is prepared, the seller's management team and investment bankers already know exactly what the selling company's financial forecasts will need to predict in order to justify the bid as fair to shareholders. Since Defendants and JMP knew the final price that the Fairness Opinion Projections would have to justify, they were incentivized to cut the projections to bias the valuation ranges for the Company downwards. As shown above, the Fairness Opinion Objections accomplished that objective, cutting the Company's calculated value in JMP's DCF and public company analyses.

90.    Sixth, the cuts in the Fairness Opinion Projections were objectively unreasonable because Carlson and director Miller were strongly motivated to sell Sharpspring to access liquidity, incentivizing them to create a forecast set that would get a deal done. Similarly, JMP had no incentive to check Defendants' conflicts of interest. These motivations and failures to check Defendants' motivations are discussed immediately below.

**D.    Motivations for the Downward Revisions and Creation of the Fairness Opinion Projections Necessary to Accomplish the Unfair Acquisition**

91.    Four main facts motivated the foregoing downward revision: (i) Defendant Carlson – who had founded the Company – was interested in liquidating his 6.1% interest in the Company and pursuing post-close employment with Constant Contact; (ii) Miller, the Company's 10.6% owner, wanted to liquidate without undermining the value of Greenhaven's stake in the Company; (iii) after realizing that Constant Contact's offer price would not amount to fair value of SharpSpring, Carlson arranged to have the Company pay him a $1 million transaction bonus at the completion of a deal, motivating him to assent to the Acquisition even at an inadequate price; and (iv) JMP was paid using a fee structure contingent on concluding a deal, meaning that it had no incentive to act as the voice of reason in the room and keep the foregoing conflicts in check.

**(i)      Carlson's Interest in Liquidating His Stake in SharpSpring**

92.     Carlson's 6.1% stake in the Company gave him an interest in accessing near-term liquidity through the Acquisition, which converted his shares to cash.

93.     Founder CEOs who maintain large stakes in a company in proportion to their personal net worth have a unique interest in pursuing a cash sale to access liquidity. Absent such a sale, founder CEOs have a limited ability to convert their shares to cash on the open market. Sales on the open market also tend to decrease the value of a CEOs remaining holdings because they tend to signal that a company's CEO believes the stock is overvalued and lacks belief in the company's long-term outlook.

94.     The all-cash Acquisition was thus Carlson's best method of exiting his stake in the Company.

**(ii)     Miller's Interest in Liquidating Greenhaven's Stake in SharpSpring**

95.     Greenhaven, owned by Miller, was SharpSpring's largest owner prior to the Acquisition. Its holdings in SharpSpring were in the name of Greenhaven Road Investment Management, L.P. which held 1,365,674 shares in total, or 10.6% of shares outstanding as of July 28, 2021. Greenhaven had started accumulating this stake in SharpSpring by 2017, when the Company's share price hovered at around $4.

96.     As Miller indicated in his fund's Q3 2018 investor letter, Greenhaven

had invested in SharpSpring based on the Company's strong track record of growth,

but was also fully aware that an acquisition would allow Greenhaven to exit its

investment at a premium:

> SharpSpring has become a Top 5 holding through a combination of price appreciation and the purchase of additional shares over several months. SharpSpring is a SaaS (Software as a Service) business that provides marketing automation software primarily for digital marketing agencies who utilize their technology to run sophisticated digital campaigns that include web pages customized based on a visitor's historical activity. […]

> SharpSpring has benefitted from multiple expansion, but also has executed well. Product revenue grew 40% in their last reported quarter. In a more recent press release, the company announced a record number of new customers in Q3 while maintaining marketing efficiency (their LTV/CAC should remain above 6). *There is a very long runway for growth for SharpSpring*. The company will benefit from secular tailwinds in an industry growing over 20% per year. *There is also a history of acquisitions in the space at premiums to where shares trade today*. SharpSpring came to my attention through a conversation with Jeremy Kahan of North Peak[.]

97.    By late 2019, Miller was interested in a merger or acquisition, and

began seeking a more active role in leading the Company. For example, in Miller's

Q2 2019 investor letter for Greenhaven issued prior to his appointment to

SharpSpring's board, Miller adverted to his plan to join the Board and sell the

Company:

> The simple heuristic is that meetings are bad, but *I have come to believe that being involved on the board of SharpSpring could be very beneficial*. First, I believe that it can lead to better returns for our fund by giving us a seat at this company's capital allocation table. *SharpSpring has to make critical decisions among growth, capital*

*preservation, and capital raising. The answers are not obvious. I would like a role in helping to flesh out those decisions and communicating them to shareholders. In addition, there have been more than a dozen acquisitions of marketing technology companies including Adobe's acquisition of SharpSpring direct competitor Marketo at 12X revenue. A similar multiple would imply well in excess of 200% return for current SHSP shareholders. I believe that SharpSpring has an attractive opportunity in front of it*, and not selling may also be a very smart decision. I think our partnership would benefit if we had voice at the table.

98.    Due to the size of Greenhaven's investment in SharpSpring, Greenhaven's most viable exit strategy by 2021 was a cash deal. Miller expressed his preference for a cash deal during the negotiations process, for instance by helping push SharpSpring away from a stock transaction with one alternative bidder.

99.    Miller also strongly supported the Board's determination in January 2021 that a sale of the Company was the best option for SharpSpring shareholders. Additionally, as stated above, Miller was key in creating the transaction bonus pool to incentivize Defendant Carlson and his management team to create the Fairness Opinion Projections and complete the Acquisition.

### (iii)    Defendant Carlson's Payout from the Transaction Bonus Pool

100.    In May 2021, Defendant Carlson began arranging for the creation of a transaction bonus pool that would offer him a considerable payout at the conclusion of a deal. Defendant Carlson first discussed the pool with representatives of JMP, who indicated their approval and then continued discussions with Defendants Huey

and Miller. The first approved bonus pool was $1.5 million, with $1 million payable to Defendant Carlson. But after Constant Contact lowered their offer to $17 per share, and immediately prior to requesting the lower Fairness Opinion Projections, Defendants doubled the pool amount to $3 million, with $1 million payable to Defendant Carlson and the remainder distributed to Company management.

101.    Constant Contact not only consented to the plan, but in effect agreed to subsidize the arrangement when it raised its bid by 10 cents more per share ($1.29 million) after being told of the payout arrangement on June 3, 2021.

102.    For Constant Contact, this was money well spent – just over a million dollars to directly buy the goodwill of the CEO on the other side of the negotiating table, instead of paying the tens of millions of dollars needed to provide fair value to SharpSpring shareholders.

103.    For Defendant Carlson, this represented a significant pay increase that he would not have otherwise received. In total, Defendant Carlson stood to receive nearly $8 million in golden parachute compensation.

104.    In addition, Defendant Carlson – and the rest of SharpSpring's officers – received additional employment benefits and the opportunity to fully participate in the future growth of the Company, including a Retention Bonus negotiated with Constant Contact for a cash payment to Defendant Carlson of $479,661.60.

105.    Notably, these Retention Bonuses were arranged despite the Proxy's

apparently contradictory statement that none of the Company's executive officers had "entered into any new agreement or arrangement with SharpSpring, Parent or any of their affiliates regarding employment with . . . the Surviving Corporation[.]"

106.   To put the value of these bonuses into perspective: given his holdings in SharpSpring, Defendant Carlson needed to secure an offer price of $22 per share to gain the same amount purely from Acquisition Consideration that he gained from bonuses.

107.   By actively negotiating with the Board and Constant Contact for unshared financial benefits at the same time he was supposed to be promoting the interests of the Company's public owners, Defendant Carlson put himself on a very different footing than SharpSpring's ordinary shareholders.

### (iv)   JMP's Conflicted Fee Structure

108.   JMP was disincentivized from keeping the above conflicts in check because its compensation structure was largely contingent on SharpSpring completing a deal. JMP's total compensation amounted to $6.35 million, of which only $750,000 was payable regardless of outcome. Thus, over 88% of JMP's compensation was payable only upon consummation of the Acquisition. As a result, if JMP had advised Defendant Carlson or the Board that it was a bad time to sell or that Constant Contact was offering too low of a price, its bankers would have lost nearly all their compensation.

109.    As is well documented in academic literature concerning conflicts in the merger and acquisition process, deal bankers are notorious for using an incentive structure that encourages them to capitulate to company management and support transactions that fail to promote shareholder value. *See* Jonathan R. Macey, The Regulator Effect in Financial Regulation, 98 Cornell L. Rev. 591, 618-23 (March, 2013) (explaining that "obtaining a fairness opinion has become like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate."). *See also* Steven M. Davidoff, Fairness Opinions, 55 AM. U.L. REV. 1557 (August 2006):

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…*conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.*
>
> This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other corporate

actors who stand to benefit from the transaction. This will ensure future lucrative business. (Emphasis added).

110.   Accordingly, it was virtually guaranteed that JMP would not risk ostracizing itself in the investment banking community by declining to render a fairness opinion or pushing Defendant Carlson and the Board to find a better deal.

### E.    The False and Misleading Statements in the Proxy

111.   As set forth above, Defendants solicited or permitted the use of their names to solicit shareholder approval for the Acquisition using a false, misleading, and omissive Proxy with the SEC.

**Materially false statement (i).**
"We[10] believe the assumptions that our management used as a basis for financial forecasts were reasonable at the time made, and that the bases on which the financial forecasts were prepared reflected the best then-currently available estimates and judgments of management of the future financial performance of SharpSpring, given the information our management had at the time." (Proxy at 51).

112.   As set forth above, this statement was false: SharpSpring had performed in line with the Plan Projections; performance below the Plan Projections had already been captured in the Downside case to the Plan Projections created in January 2021 (which were *higher* than the Fairness Opinion Projections); and the cuts made in the Fairness Opinion Projections were inconsistent with metrics concerning the Company's post-January performance and Defendants' statements

---

[10] As defined by the Proxy, "we" refers to the Company unless otherwise indicated.

concerning the Company's performance and prospects up to the announcement of the Acquisition.

113.   Moreover, and as explained above, Defendants were ***aware*** that that the downward-revised Fairness Opinion Projections were inconsistent with the Company's operating metrics and Carlson's public statements; that the downward-revised Fairness Opinion Projections needed to be created to justify a fairness opinion for Constant Contact's lower-than-expected bid; and that the Plan Projections already incorporated management's beliefs about the business difficulties later referenced pretextually as a justification in the Proxy for the creation of the Fairness Opinion Projections.

114.   The downward revisions were thus intended to reduce the Company's apparent value – not create projections that were more reflective of the Company's financial reality.

115.   In sum, contrary to the Proxy's representation, Defendants did not actually believe that the Fairness Opinion Projections were reasonable and based on management's best estimates of the Company's future performance, and the Proxy's misrepresentation to the contrary was a falsehood designed to induce shareholder support for the Acquisition.

**Materially misleading statement (ii); Material omission (iii)**.
The independent members of the Board continued the discussion at the June 2, 2021 meeting in executive session without Mr. Carlson or other members of management, and discussed seeking to have

Parent increase the proposed merger consideration to $17.25 per share. As part of the discussion, the independent members of the Board noted the prior conversation in which Parent indicated that it was unwilling to increase their purchase price above $17.00 per share and concern that insisting on a higher purchase price could result in Parent and its representatives terminating negotiations. Separately, the independent members of the Board in executive session noted additional capacity for transaction-related assumed in the letter of intent, and considered the need to retain key employees during the pendency of the potential transaction and the possibility of increasing the transaction bonus pool from the aggregate amount of $1.5 million, which had been previously discussed by Mr. Huey and Mr. Miller, to $3.0 million in order to increase the number of SharpSpring employees who could be induced to remain with SharpSpring through the completion of the transaction and continue to work toward a successful closing (with no increase to the previously contemplated payment to Mr. Carlson or other executives in connection with the transaction bonus pool). After additional discussion about their desire to move forward expeditiously and the relatively modest potential risk that the additional requests to Parent could imperil the proposed transaction, the consensus of the directors present at the conclusion of the executive session was that Mr. Huey would instruct Mr. Carlson to obtain JMP Securities' viewpoint on the magnitude of the potential risk associated with the additional requests and, assuming the risk was modest, to proceed, with the assistance of representatives of JMP Securities, with a request to Parent to increase the proposed merger consideration to $17.25 per share and to inform Parent of the revised estimate of transaction expenses, while reaffirming that aggregate transaction-related expenses incurred by SharpSpring would remain within Parent's assumed $10.0 million of transaction-related expenses to be incurred by the Company. After the executive session concluded, Mr. Huey communicated the instructions to Mr. Carlson by telephone.

On the evening of June 2, 2021, and the morning of June 3, 2021, communications ensued among Mr. Carlson, the Board of Directors and representatives of JMP Securities regarding the Board's proposed requests to Parent with respect to the terms set forth in the June 2, 2021 letter of intent. Representatives of JMP Securities expressed their belief to Mr. Carlson, who in turn relayed it to the

full Board, that the proposed message to Parent as instructed by the independent members of the Board would not present a material risk of Parent terminating negotiations. **Representatives of JMP Securities communicated a request to representatives of Parent to increase the per share merger consideration**. Separately, representatives of JMP Securities informed Parent of the Company's intentions with respect to the aggregate amount of the transaction bonus pool. Following additional communications among Mr. Carlson, representatives of JMP Securities, Mr. Vella and other representatives of Parent, on the evening of June 3, 2021, Parent agreed to increase the proposed price per share to $17.10. Representatives of JMP Securities subsequently requested from representatives of Parent an additional increase in the price per share to $17.25, but representatives of Parent declined to further increase the price.

On June 3, 2021, representatives of Sidley delivered to Godfrey & Kahn a draft exclusivity agreement providing for a 14-day exclusivity period with an automatic extension of seven days if Parent was continuing its evaluation in good faith.

**On June 4, 2021, the Board of Directors held a special meeting to continue the discussion of the June 2, 2021 non-binding letter of intent from Parent, and specifically to receive input from representatives of JMP Securities regarding the proposed terms of the letter of intent. All members of the Board were present, as well as Mr. Jackson and representatives of each of JMP Securities and Godfrey & Kahn. Mr. Carlson provided an update regarding the discussions with Parent. The representatives of JMP Securities presented to the Board an update on the process to date, the next steps in the process, an overview of the bid received, and an update of its preliminary financial analysis based on then-current Wall Street research consensus estimates and other publicly available information. The Board and management again discussed the Company's results for the year to date, the fact that the results were below the January 2021 Budget, and the continued negative trends in the Company's business. The Board concluded that, based on the factors discussed at previous meetings, the January 2021 Budget did not accurately reflect the likely performance of the Company in the**

**future and accordingly instructed management to update the 2021 projections to be consistent with management's and the Board's expected performance of the business. Representatives of Godfrey & Kahn reviewed with the Board the draft exclusivity agreement, including its proposed term. Following this discussion, the Board authorized Mr. Carlson to move forward with an exclusivity agreement between the Company and Parent based on the updated proposal from Parent.**

116.    The statement that "representatives of JMP Securities communicated a request to representatives of Parent to increase the per share merger consideration" was misleading because – in the context of the prior paragraph regarding the Board's instruction that the counteroffer would be $17.25 per share – it falsely implied that JMP had communicated the Company's authorized counteroffer of $17.25, not a mistakenly low counteroffer for $17.10.  As explained above and as revealed by SharpSpring's June 4, 2021 Board minutes, that is not what transpired, and JMP's mistaken counteroffer was accepted by Constant Contact and became the final per-share consideration.

117.    Moreover, because the Proxy failed to reveal the truth – namely, (a) that JMP had sought $17.10 and not $17.25 in its counteroffer; (b) that Carlson had declined at the Board's June 4, 2021 meeting to return to Constant Contact with a further $17.25 counteroffer; and (c) that the Board had concurred with Carlson's declination – the Proxy failed to provide shareholders a candid explanation of a key end-stage error in the negotiations process and the Board's response to that error.

118.    The Proxy thus rendered the description of JMP's mistake and the

Board's subsequent actions misleading and omissive and concealed that JMP had

potentially left millions of dollars in consideration on the table.

### F. SharpSpring Shareholders Suffered Financial Harm as a Result of the False and Misleading Proxy

119.   The Proxy caused SharpSpring's stockholders harm by inducing them

to accept a deal that underpriced the Company and therefore failed to compensate

stockholders for the inherent value of their shares. Moreover, since the acquisition

could not have occurred without the approval of Company shareholders, the Proxy

was an essential link in the accomplishment of the sale and the misleading statements

were the cause of the Class's economic loss.

120.   First, the Acquisition Consideration represented **36% *discount*** to the

Company's publicly traded price as recently as February 2021, when SharpSpring

stock traded $26.78 per share.

121.   Second,  the Acquisition sold the Company for less on a per share basis

than the lowest Street valuation analyses available in March 2021, which valued

SharpSpring stock in the range of $18-25 per share.[11] I.e., without even accounting

for a transaction premium, expert analysts predicted SharpSpring's stock would

---

[11]   *See*, *SharpSpring, Inc. Released Earnings Last Week and Analysts Lifted Their Price Target To US$21.25*, Yahoo Finance (Mar. 19, 2021) ("Currently, the most bullish analyst values SharpSpring at US$25.00 per share, while the most bearish prices it at US$18.00.") (https://finance.yahoo.com/news/sharpspring-inc-nasdaq-shsp-released-063319421.html)

reach $25 per share.

122.  Notably, JMP opted to not provide any analysis or summary of these analyst price targets, as is commonplace in merger proxy statements – leaving shareholders in the dark about Wall Street's valuation of the Company and the Acquisition Consideration's relative lack of value. Analyst reports are proprietary and not easily accessible to the public even in summarized form, with even secondhand descriptions of their contents often only available on boutique financial media websites. JMP's decision to ignore these reports is a strong signal that SharpSpring was worth far more than the Acquisition Consideration provided.

123.  Third, as financial commentators reported, SharpSpring's stock could reasonably have been expected to rise in value if given time to start trading at a sales-to-share-price multiple more reflective of its peer companies in the marketing automation sector. For instance, if the Company started trading along with its peers at 12x its revenue, then the Company's stock price would range from $26 to $38 per share. Notably, this 12x revenue figure is not cherry picked from a single commentator, but the same figure used by Miller in his letter to Greenhaven investors.

124. At bottom, if Company shareholders had been informed of SharpSpring's true value at the time of the acquisition, the Board would have been unable to obtain a fairness opinion from JMP, and SharpSpring shareholders would

not have voted to approve the Acquisition offering them $17.10 per share. Moreover, Defendants' conduct caused Company shareholders to lose out on alternative options that offered greater value, including independently growing the Company or seeking better offers from alternative bidders, including potential stock transactions (precluded by Miller) that would have allowed shareholders (and not just Company management) to continue in the future growth of the Company.

125.   Accordingly, SharpSpring shareholders suffered damages in the amount of the difference between the price received in the Acquisition and the fair value of their shares as calculated in accordance with recognized methods of valuation.

## CLASS ACTION ALLEGATIONS

126.   Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of SharpSpring (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

127.   This action is properly maintainable as a class action because:

(a)   the Class is so numerous that joinder of all members is impracticable. As of July 28, 2021, the record date to vote on the Acquisition, there were 12,886,660 shares of SharpSpring common stock outstanding, held by hundreds to

thousands of individuals and entities throughout the country. The actual number of former public stockholders of SharpSpring will be ascertained through discovery;

(b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i.    whether Defendants misrepresented material information in the Proxy in violation of Section 14(a) of the Exchange Act;

      ii.   whether Carlson violated Section 20(a) of the Exchange Act; and

     iii.  whether the Class suffered damages.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### (Against Defendants SharpSpring and Carlson)

128.   Plaintiff realleges the allegations set forth above as if fully set forth herein.

129.   Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

130.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

131. Defendants issued the Proxy to solicit SharpSpring shareholders' support for the Acquisition. Carlson reviewed and authorized the dissemination of the Proxy, which misrepresented and omitted the above-referenced material information, which in turn rendered the above-referenced sections of the Proxy materially false, misleading, and incomplete because such sections provided a false, misleading, and incomplete valuation picture of SharpSpring. The Proxy contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

132. Carlson, by virtue of his roles as CEO and a director of SharpSpring, and as alleged above, failed to ensure that the information contained in the Proxy Misrepresentations was corrected or was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. Carlson knew that the Proxy was materially false, misleading, and incomplete in regard to the above-referenced Proxy Misrepresentations. Carlson reviewed and relied upon the material information identified above in connection with his decision to approve and recommend the Acquisition; indeed, the Proxy states that JMP reviewed and discussed its financial analyses with the Board, of which Carlson was a member, and further states that the Board considered both the financial analyses provided by JMP as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, Carlson were privy to and had knowledge of the true

facts concerning the process involved in selling SharpSpring and SharpSpring's true value, which was far greater than the Acquisition Consideration the Company's former shareholders received.

133.    Carlson knew that the material information identified above had been misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete. Indeed, Carlson was required to review JMP's valuation analyses, question JMP as to its derivation of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. After reviewing both the underlying materials and the Proxy, Carlson failed to provide a non-misleading proxy solicitation.

134.    Carlson was responsible for ensuring that the Proxy was not misleading, but failed to do so.

135.    SharpSpring is liable for violations of the Exchange Act as the issuing entity of the Proxy.

136.    The above-referenced Proxy Misrepresentations were material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Acquisition and rendered the Proxy materially false, misleading, and

incomplete.

137.   As a direct and proximate result of the dissemination of the materially

false, misleading, and incomplete Proxy to obtain shareholder approval of the

Acquisition, Plaintiff and the Class have suffered damages and actual economic

losses (i.e., the difference between the value they received as a result of the

Acquisition and the true value of their shares at the time of the Acquisition) in an

amount to be determined at trial.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against Defendant Carlson)

138.   Plaintiff realleges the allegations set forth above as if fully set forth

herein.

139.   Defendant Carlson acted as a control person of SharpSpring within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his

position as CEO and a director of SharpSpring, and participation in and/or awareness

of the Company's operations and/or intimate knowledge of the false, misleading,

and incomplete statements contained in the Proxy filed with the SEC, Carlson had

the power to influence and control – and did influence and control – directly or

indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially false,

misleading, and incomplete.

140.   Carlson was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

141.   Carlson had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the members of the Board to approve the Acquisition. Moreover, as a director, Carlson was responsible for signing the Proxy "By order of the Board of Directors." He was thus directly involved in preparing this document.

142.   In addition, as the Proxy sets forth at length, and as described herein, Carlson was involved in (i) negotiating, reviewing, and/or approving the Acquisition and (ii) preparing, reviewing, and/or approving the Fairness Opinion Projections. The Proxy describes the various issues and information that Carlson reviewed and considered. Carlson participated in drafting and/or gave their input on the content of those descriptions.

143.   By virtue of the foregoing, Carlson violated Section 20(a) of the Exchange Act.

144.    As a direct and proximate result of Carlson's conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the difference between the value they received as a result of the Acquisition and the true value of their shares at the time of the Acquisition) in an amount to be determined at trial.

<u>**PRAYER FOR RELIEF**</u>

Wherefore, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.    Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: September 14, 2022

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (*pro hac vice*)
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com


**OF COUNSEL**

**SMITH, GAMBRELL & RUSSELL, LLP**
Alan S. Wachs
Florida Bar No.: 980160
awachs@sgrlaw.com
Richard D. Rivera
Florida Bar No.: 0108251
rrivera@sgrlaw.com
50 N. Laura Street, Suite 2600
Jacksonville, Florida 32202
Tel.: (904) 598-6110
Fax: (904) 598-6210

*Attorneys for Plaintiff*